UNITED STATES of America,
Plaintiff-Appellant,

v.

Donald Wesley TAYLOR,
Defendant-Appellee.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven Wayne PRESSLER, and Donald Wesley Taylor, Defendant-Appellants.

Nos. 81–1769, 81–1770 and 81–1785.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 17, 1982.

Decided Sept. 23, 1983.

Gary V. Scales, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellant.

George F. Klink, David M. Heller, McGroder, Pearlstein, Peppler & Tryon, Phoenix, Ariz., for defendant-appellee.

Before FLETCHER and BOOCHEVER, Circuit Judges, and KENYON,* District Judge.

BOOCHEVER, Circuit Judge:

Donald Wesley Taylor and Steven Wayne Pressler were convicted of conspiracy to manufacture amphetamines and attempt to manufacture amphetamines. The Government and both defendants appeal. Taylor contends that the search of his residence was illegal because the information contained in the affidavit offered in support of the warrant failed to establish probable cause. Pressler contends that: (1) the trial court erred in denying his motion to suppress because his arrest was based on less than probable cause, (2) his trial should have been severed from Taylor's trial, (3) the district court committed reversible error by allowing certain questions during cross-examination, and (4) the evidence was insufficient to support his convictions. Both defendants contend that: (1) the trial court erred in allowing the Government to comment on the contents of two chemical bottles that were labeled but never analyzed, and (2) under the facts of this case, the jury instruction on attempt was inadequate. The Government appeals the dismissal of the "Dangerous Special Drug Offender" notice it filed against Taylor.

## FACTS

The essence of the Government's case was that Taylor was operating, or attempting to make operable, an amphetamine laboratory at his home in Camp Verde, Arizona. Taylor has a ten-year history of being involved in the illegal manufacture of amphetamines. Pressler's principal role in the scheme appears to have been to pick up previously ordered chemicals at a chemical supply store.

The Government's investigation commenced when orders were placed at a Phoenix chemical supply store for chemicals used in manufacturing amphetamines. The first two orders were placed by a woman who identified herself as Carla Delwish, the maiden name of Taylor's wife. Personnel at the chemical supply store notified the Drug Enforcement Administration ("DEA") that orders had been placed for suspect chemicals. Although the first two orders were placed by Carla Delwish, a man later identified by a store employee as Pressler picked up the chemicals. The second time Pressler came to the store to pick up the chemicals, he also picked up several chemical supply catalogues and ordered additional chemicals.

In late January of 1981, based on the information obtained from the chemical supply store, DEA agents secured a warrant authorizing them to hide a "beeper" tracking device in a box containing the chemicals ordered by Pressler. On February 2, 1981, Sharon Coley (Taylor's sister) picked up the beeper box and brought it to her home. Sometime between February 13th and 18th, the beeper box was removed from Coley's home to Taylor's home. Prior to the time the beeper box was moved, the DEA agents watching Coley's house observed Taylor transfer boxes from the house to Taylor's vehicle. Also prior to the date the beeper box was moved, Pressler visited the chemical supply store again to inquire about expensive laboratory glassware.

---

* The Honorable David V. Kenyon, United States District Judge for the Central District of California, sitting by designation.

On February 20, 1981, DEA and state agents executed search warrants at the residences of Coley and Taylor. The principal evidence found at Coley's home were receipts for the chemicals she and Pressler had picked up and a radio scanner tuned to a DEA channel.

Prior to executing the warrant for Taylor's home, the police and DEA agents borrowed a firetruck, disguised themselves as firemen and told residents that a propane truck had overturned nearby. They also had volunteer firemen man a roadblock while dressed as emergency medical technicians. The Government claims this was done as a safety precaution because of the explosive nature of the chemicals they suspected were being stored at the house, but testimony at trial indicates that this was done as a ruse to get Taylor to vacate his house.

Before execution of the search warrant, Taylor and Pressler attempted to drive away from the house, but were stopped and arrested. Taylor was arrested at gunpoint when he stepped out of his vehicle.

The parties give differing accounts of Pressler's arrest. It is clear that another officer approached the vehicle while Taylor was being arrested and told Pressler to raise his hands and step out. Pressler failed to comply until the officer repeated his order several times. The Government states in its brief that Pressler became "verbally uncooperative" when he stepped out so the agent ordered him to lie face down in a ditch and handcuffed him. The Government further states that several minutes later, a second agent approached Pressler, recognized Pressler from a description given by an employee at the chemical supply house as the person who had picked up the chemicals, and arrested him.

The record supports Pressler's contention that he did not become "verbally uncooperative", as the Government describes it, until after he was handcuffed face down in the ditch.

The agents proceeded to search Taylor's residence and seized hundreds of items, including some of the chemicals necessary to manufacture amphetamines, Taylor's handwritten formulas for producing controlled substances, and miscellaneous laboratory equipment. Agents failed to find any already-produced amphetamines or a working laboratory.

Taylor and Pressler were charged in a four count indictment with conspiring to manufacture amphetamines during two separate time periods, attempt to manufacture amphetamines (21 U.S.C. §§ 841(a)(1), 846 (1976)), and use of a firearm during the commission of a felony (18 U.S.C. § 924(c)(1) (Supp. V 1981)). After a nine-day trial, both defendants were convicted of one of the two conspiracy charges and the attempt charge and acquitted on the other two counts. Pressler was sentenced to concurrent sentences of five years on each count, of which only the first six months had to be spent in prison. Taylor received sentences of five years imprisonment on the conspiracy count, followed by five years of probation on the attempt count.

I.

### Search Warrant

Taylor contends that the warrant to search his house, yard, and vehicle was based on less than probable cause because the information in the supporting affidavit was either stale or was obtained from tracking the beeper device. The argument is meritless because the information obtained from tracking the beeper was not constitutionally infirm and amply corroborated the allegedly stale information.

The validity of a search warrant depends upon the sufficiency of what is found within the four corners of the underlying affidavit. *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir.1978). An affidavit is sufficient if it establishes probable cause; that is, if the stated facts would reasonably allow a magistrate to believe that the evidence will be found in the stated location. *Id.* Thus, contrary to Taylor's contention, the affidavit need not establish that it was "more likely than not" that evidence would be found or preclude other

innocent interpretations for the activities at his house. The affidavit need only "enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit." *United States v. Hendershot,* 614 F.2d 648, 654 (9th Cir. 1980).

■ Deference is accorded to a magistrate's decision to issue a warrant. *Martinez,* 558 F.2d at 1234. Three "types" of information were offered in support of the search warrant in this case. First, the agent gave detailed information regarding Taylor's involvement in manufacturing amphetamines over the previous ten years. Second, the agent's affidavit incorporated the previous affidavit made by the same agent to obtain the warrant to install and track the beeper device. The beeper affidavit described the suspicious transactions at the chemical supply store and included an expert chemist's opinion that the chemicals were "probably" being used to manufacture illegal drugs. Third, the agent detailed the information derived from tracking the beeper to Coley's and Taylor's homes.

■ The information regarding Taylor's previous drug history was relevant in that it was consistent with the agent's and police chemist's opinions regarding the suspicious activities detailed in the two affidavits. Taylor's claim that the agent's information was stale overlooks the fact that the affidavit disclosed that the beeper still signalled that the box of precursor chemicals was at Taylor's residence the day the warrant was sought.

Taylor's contention that the electronic beeper violated his privacy rights in his home has been answered by *United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and *United States v. Brock,* 667 F.2d 1311 (9th Cir.1982). In *Knotts,* the Supreme Court held that the

tracking of a warrantless beeper placed in a drum of chloroform was neither a "search" nor a "seizure" within the meaning of the fourth amendment. 103 S.Ct. at 1087. There could be no expectation of privacy where the automobile transporting the drum was in plain view while on public thoroughfares or where the drum was open to observation while in the "open fields" while on private property. *Id.* 103 S.Ct. at 1085–86. The Court did not reach the issues of the warrantless installation of the beeper, *id.* 103 S.Ct. at 1084 n. *, or of the permissibility of monitoring the movement of the beeper while within the private residence. *Id.* 103 S.Ct. at 1087. These questions have been answered in this circuit by *Brock.*

■ In *Brock,* this court upheld the warrantless[1] installation and monitoring of a beeper in a can of precursor, non-contraband chemicals. 667 F.2d at 1322. The court held that monitoring the device after it was carried into a private residence was not a "search" due to the minimal degree of intrusion. *Id.* at 1321–22. There can be no fourth amendment objection to the use of the beeper in the present case because a warrant for its installation was obtained.[2]

■ The facts before the magistrate were sufficient to establish probable cause to believe that evidence of drug-related activity would be found at Taylor's residence.

## II.

### Motion to Suppress

Pressler argues that: (1) *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), is inapplicable because it was unnecessary to detain him during the execution of the warrant to search Taylor's house and vehicle; (2) the initial handcuffed detention constituted an arrest without probable cause, not a stop as permitted

---

1. We agree with Judge Adams, concurring in *Brock,* that it is certainly the better practice for the Government to obtain a warrant from a magistrate before installing and monitoring beeper devices. 667 F.2d at 1324–25 (Adams, J., concurring). In this case, such a warrant was obtained.

2. The beeper was not used to monitor movement of the chemicals within the house, so that issue is not before us.

by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 22 L.Ed.2d 889 (1968); and (3) the officers lacked probable cause to arrest.

The district court denied the suppression motion. It found that the first officer's "detention" of Pressler was justified under *Michigan v. Summers* and that there was probable cause for arrest by the time the second officer became involved. A clearly erroneous standard of review is applied to the historical facts found by the trial court. As to the determination of probable cause, we reach the same result under either a clearly erroneous standard or *de novo* review. We shall consider each of the points raised by Pressler.

### A. Detention Incident to Execution of a Search Warrant

■ The district court upheld Pressler's detention under *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), as a seizure incident to the execution of a search warrant. In *Summers,* the Supreme Court held that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S.Ct. at 2595. The Court noted that the detention constituted a "seizure" without probable cause. *Id.* at 696, 101 S.Ct. at 2590.

The applicability of *Summers* presents a close question. Initially we note that there is no merit to Pressler's attempt to distinguish *Summers* on the grounds that he lacked an interest in the premises subject to the warrant sufficient for standing and was not at the premises when detained. The Court clearly framed *Summers* in terms of "occupants", not owners, and explicitly found no constitutional significance in the fact that some of the "occupants" were seized on the sidewalk as they were leaving

the house. *Id.* at 702 n. 16, 101 S.Ct. at 2594 n. 16.

On the other hand, however, much of the justification for the rule announced in *Summers* is inapplicable to Pressler's situation. In *Summers,* the "occupants" were kept in or brought back into the house being searched and kept there throughout the search or at least until the police discovered sufficient evidence to justify arresting them. The Court discerned two governmental purposes justifying the detention: (1) "preventing flight in the event that incriminating evidence is found", *id.* at 702, 101 S.Ct. at 2594, and (2) facilitating "the orderly completion of the search" by the presence of the occupants of the premises, *id.* at 703, 101 S.Ct. at 2594. The second purpose is based on the notion that the "self-interest [of the detained individuals] may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the [search]." *Id.*

It is clear from the first officer's testimony at the suppression hearing that neither of these purposes motivated his detention of Pressler. Nor was Pressler's detention likely to advance either governmental purpose articulated in *Summers,* especially the second. Unlike the individuals in *Summers,* Pressler was not detained in or adjoining the place being searched and was obviously in no position to facilitate the orderly completion of the search of Taylor's home while lying handcuffed face down in a ditch some distance from the house.[3]

We conclude that the detention of Pressler cannot be justified on the basis of *Michigan v. Summers.*

### B. Terry Stop

Using the ruse described above, law enforcement officers had evacuated Taylor's neighborhood. Taylor and Pressler eventually left Taylor's house in Taylor's truck,

---

3. Although the Government does not argue the point, it is plausible that Pressler might have been taken to Taylor's house during the search but for the second officer formally arresting

him shortly after the initial seizure. Nothing in the record, however, suggests that the officers intended to do so.

Taylor driving. When, within a short distance, Taylor spotted one of the officers, Agent Teague, Taylor stopped the truck, got out, and approached Teague to ask what was happening. Officers on the scene had been warned that prior experience with Taylor indicated that he was likely to be dangerous. Teague stopped Taylor at gunpoint, while another agent, Gamble Dick, approached the vehicle with his gun drawn and aimed at Pressler, who was seated in the passenger seat of the truck. Agent Dick ordered Pressler to raise his hands. Pressler did not comply, but made furtive movements with his hands inside the vehicle. Dick again ordered Pressler to raise his hands, and again Pressler did not comply. Finally, Pressler complied the third time the officer gave him the order. Dick directed Pressler to lie face down in a ditch where he was handcuffed and frisked. Within a very short time, Agent Checkoway arrived on the scene. Checkoway recognized Pressler as the person who had picked up chemicals ordered by "Delwish" and had inquired at the chemical company about purchasing expensive laboratory glassware. Pressler also volunteered to the officers that he lived at Taylor's house, which was the repository of the chemicals and the site of the suspected drug laboratory. Checkoway formally arrested Pressler.

We consider each of the actions taken by the officers toward Pressler: Agent Dick's armed approach, the handcuffing, and the arrest. In our view, the initial detention and handcuffing of Pressler were justified as a *Terry* stop. Subsequently, when Agent Checkoway formally arrested Pressler he had probable cause to do so.

 The law enforcement officers had a legitimate investigatory purpose in stopping Taylor, founded suspicion that he

was manufacturing amphetamines, as had been detailed in the affidavit in support of the search warrant. When the officers stopped Taylor and his apparent confederate, Pressler, to question them, we believe that the officers were justified in drawing their weapons in self-protection. The Supreme Court has recognized "that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).[4] The purpose of a *Terry* stop is "to allow the officer to pursue his investigation without fear of violence". *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923. Earlier on the day in question, Agent Dick and the other officers on the scene had attended a briefing where they had been told that Taylor was dangerous and were warned that others with Taylor should also be considered dangerous.

Pressler argues that *United States v. Strickler,* 490 F.2d 378 (9th Cir.1974), mandates a different result. In *Strickler,* the police were watching a house where they expected cocaine to be delivered. The police observed a car drive past the house twice, the unknown occupants of the car looking in the direction of the house the first time. Later at some distance from the house police cars surrounded the car and one of the officers pointed a gun at the occupants of the car and ordered them to raise their hands. The court stated that it could not equate the armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands with the brief investigatory stop authorized by *Terry* and *Adams.* 490 F.2d at 380. On the facts of the case, though, it is clear that the drawing of weapons would not have been permissible for other grounds: the police

---

4. We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take un-

necessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.
*Terry v. Ohio,* 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 22 L.Ed.2d 889 (1967).

had no legitimate fear for their safety and only tenuous reasons to believe that the occupants of the car were involved in the drug transaction. In the present case, the law enforcement agents had strong evidence of drug activity and valid reason to fear for their safety.

■ The handcuffing and frisk of Pressler for weapons was similarly justified. Twice Pressler had disobeyed an order to raise his hands, and he made furtive movements inside the truck where his hands could not be seen. At this point Agent Dick found it wise to frisk Pressler for weapons. Because there were two suspects and only two or three officers on the scene, Agent Dick deemed it prudent to have Pressler lie down and be handcuffed during the frisk. We have previously held that the use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do not necessarily convert a *Terry* stop into an arrest necessitating probable cause. *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982). *See United States v. Thompson,* 597 F.2d 187, 190 (9th Cir.1979). Likewise, requiring the suspect to lie down while a frisk is performed, if reasonably necessary, does not transform a *Terry* stop into an arrest.

■ After frisking Pressler, the officers required him to remain in this prone, handcuffed position for three to five minutes before he was formally placed under arrest by Agent Checkoway. During this time, Pressler was "extremely verbally abusive" and "quite rowdy". It was not necessary for the officers to remove Pressler's handcuffs or to return Pressler to his feet immediately upon completing the frisk. The restrictions eliminated the possibility of an assault or attempt to flee, particularly if an arrest became imminent, as indeed it did. *See Bautista,* 684 F.2d at 1290.

*C. The Arrest*

■ When Agent Checkoway arrived on the scene, he consulted with other officers, recognized Pressler, and formally placed Pressler under arrest. Checkoway recognized Pressler as matching the description of a person who had picked up drug precursor chemicals ordered by "Delwish", and had inquired about purchasing laboratory glassware. The description included height, weight, age, hair color and length, and beard type. The courier was also described as wearing a Harley-Davidson belt buckle. Pressler fit the description in all respects. In addition, Checkoway knew of Pressler's claim of also living at Taylor's trailer home, which was the repository of the chemicals and drug formulae and the suspected site of the drug laboratory. In all, we conclude that Agent Checkoway possessed probable cause to arrest Pressler.

We therefore affirm the district court denial of the motion to suppress.

### III.

#### Severance

■ Pressler contends that the trial court committed reversible error in refusing to sever his trial from Taylor's. The issue concerns testimony given by a DEA agent regarding statements allegedly made by Taylor and Pressler while the agent was driving the two defendants to the police station to be booked. According to agent Parra, Taylor said that he had considered shooting it out with the law enforcement agents but had decided against it because he felt that he had not done anything wrong. He convinced Pressler to come out peacefully and they unloaded their guns. Agent Parra stated further that Pressler had said that he favored shooting it out with the law enforcement officers but that he had agreed with Taylor and decided against it. Pressler also allegedly said that he did not trust law enforcement officers and that it had been his experience that they could not be trusted. At trial, Pressler testified that he never made the statement to agent Parra about preferring to shoot it out, but was unable to question Taylor about the conversation with agent Parra because Taylor chose not to testify, as was his right.

The general rule is that defendants jointly charged are jointly tried. *See United States v. Gay,* 567 F.2d 916, 919 (9th Cir.), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978). This rule is applicable in conspiracy cases. *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). Fed.R.Crim.P. 14 provides, however, that the trial court may grant a severance when it appears that a defendant would suffer significant prejudice from a joint trial.

Pressler argues that his trial should have been severed from Taylor's, citing *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). *Bruton* is inapplicable here because Taylor's statement that Pressler wanted to shoot it out with the police was merely cumulative to Agent Parra's testimony that Pressler had given the same information. Pressler cross-examined Agent Parra about the conversation. Pressler took the stand and denied that the conversation took place. We therefore affirm the denial of severance.

## IV.

### Improper Questioning at Trial

■ Pressler contends that the trial court committed reversible error in not sustaining his objections to certain questions asked by the Government at trial. First, the prosecutor asked Pressler whether, when re-arrested on May 7, 1981, in the presence of DEA agents he had told his girlfriend to tell Taylor to "get out of there". The prosecutor also asked Pressler if he had told a DEA agent that he lived at the Taylor residence. Pressler denied making these statements, and the Government did not offer testimony from the agents in question to support the questions. Pressler relies on *County of Maricopa v. Maberry,* 555 F.2d 207 (9th Cir.1977). He contends that his confrontation rights were violated by the Government's failure to recall the agents who overheard the statements so as to rebut Pressler's denial of having made

them. We disagree. The statements made in this case were not nearly so inflammatory as those in *Maberry. See United States v. Jones,* 592 F.2d 1038, 1044 n. 9 (9th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979) (pointing out that *Maberry* was a case in which the complained of questioning was highly "prejudicial", clearly "improper", and "unethical").

■ The second line of allegedly objectionable questioning involved DEA Agent Henderson's testimony. On cross-examination, defense counsel asked the DEA agent whether or not drug manufacturers use "intermediaries" or "third parties" to pick up chemicals so as to insulate themselves from detection. On re-direct, the prosecuting attorney asked the witness whether, in his experience, these third parties are always, sometimes, or never involved in the illegal manufacturing operation. The witness answered that, in his experience, "innocent" third parties were not used to pick up chemicals. We find that defense counsel "opened the door" to this line of questioning, *see United States v. Millican,* 424 F.2d 1038, 1039–40 (5th Cir.1970), and that the trial court did not abuse its discretion in permitting the question. Fed.R.Evid. 611(a).

## V.

### Sufficiency of the Evidence

■ Pressler next contends that there was insufficient evidence to support a conviction on either count. In addressing this contention, the reviewing court determines whether the evidence, viewed in the light most favorable to the Government, would permit any rational trier-of-fact to conclude that the defendant was guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *United States v. Nelson,* 419 F.2d 1237, 1241 (9th Cir.1969).

Pressler argues that the evidence, even when viewed under the appropriate standard, failed to show that he was something more than an unwitting errand runner. He contends that the Government did no more

than pile inference upon inference to persuade the jury that he was a major actor, rather than an "unsuspecting pawn", in Taylor's scheme.

The difficulty with Pressler's argument is that the reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. *See United States v. Ramos,* 558 F.2d 545, 546 (9th Cir.1977). There was sufficient evidence to support the verdicts against Pressler. There was testimony, *inter alia,* that Pressler picked up the suspect chemicals ordered by Taylor's wife; that he later secured a catalogue of chemicals and inquired about purchasing expensive laboratory glassware (he failed to claim any legitimate use for the glassware at trial); that he periodically resided at Taylor's house, where extensive precursor chemical supplies and laboratory equipment were found; and that he made the incriminating statement about wanting to shoot it out with police.

## VI.

### Admission of and Reference to Unanalyzed Chemical Exhibits

Taylor, joined by Pressler (by incorporation), contends the trial court abused its discretion in admitting and allowing the Government to refer to two chemical containers that were labeled, but the contents of which were never chemically tested. Defendants contend that there was inadequate foundation to admit the exhibits.

 The contention is meritless. First, the defendants' failure to object to one of the two exhibits precludes reversal absent plain error. Fed.R.Evid. 103(a)(1), (d). Second, the Government laid an adequate foundation by identifying the exhibits as filled containers labeled "platinum

oxide" and "hydrogen" that were seized at Taylor's residence. *See* Fed.R.Evid. 901. The fact that the exhibits were never analyzed goes to their weight as evidence, not their admissibility. *See United States v. Brewer,* 630 F.2d 795, 801–02 (10th Cir. 1980). Third, once the exhibits were admitted it was not improper for the prosecution to argue that in all likelihood the contents matched the label. Finally, given the extensive number of chemical exhibits introduced at trial, it seems unlikely that the admission of these two exhibits, even if improper, was prejudicial error. We therefore find no reversible error.

## VII.

### The Convictions of Attempt

 The defendants were convicted of both attempt and conspiracy under 21 U.S.C. § 846. They contend that the trial court did not adequately instruct the jury on attempt. In *United States v. Snell,* 627 F.2d 186, 187 (9th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 957, 101 S.Ct. 1416, 67 L.Ed.2d 382 (1981), this court stated that a conviction for attempt requires proof of culpable intent and conduct constituting a *substantial* step toward commission of the crime that strongly corroborates that intent. In the case before us, the district court instructed the jury on attempt that:

> To "attempt" an offense means willfully to do some act in an effort to bring about or accomplish something the law forbids to be done.

> An act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

This instruction was taken verbatim from 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 14.21, at 437 (3d ed. 1977).[5]

---

**5.** In *United States v. Conway,* 507 F.2d 1047, 1052 (5th Cir.1975), the Fifth Circuit held that the first paragraph of the instruction, standing alone, instructed the jury accurately on the applicable law. The contention made in *Conway* was that the instruction "gave an inade-

quate definition of the word 'attempt' ", defendant citing no authority. The contention was apparently not made that the instruction failed to require a substantial step. Moreover, in *Conway* the defendant had failed to object and so the court reviewed for plain error. In the

The instruction given nowhere discussed the substantial step requirement. The instruction merely required "some act" in an effort to bring about or accomplish a forbidden object. "Some act" could include an act of mere preparation, which does not constitute a substantial step. *E.g., United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Counsel objected to the instruction and submitted a requested instruction distinguishing between mere preparation and an overt act likely to result in the commission of the offense. We therefore hold that on the facts of this case the jury instruction was inadequate, and reverse each of the defendants' convictions of attempt.[6]

## VIII.

### Special Drug Offender Notice

Prior to trial, the Government filed a notice with the district court clerk pursuant to 21 U.S.C. § 849(a) (1976) that Taylor was a dangerous special drug offender as defined by section 849(e)(3) (1976). Two days into the nine-day trial, the clerk's office inadvertently brought the notice to the attention of the judge presiding over Taylor's trial rather than to the attention of the district's chief judge. The trial judge con-

tinued to preside over the trial, and did not notify the parties of the problem until the notice was unsealed when the guilty verdicts were returned. At that point, the trial judge recused himself, and reassigned all further proceedings to another judge. The second judge dismissed the notice, finding that 21 U.S.C. § 849(a) imposes strict liability on the Government to insure that the trial judge does not learn of the notice prematurely. Section 849(a) provides, in relevant part:

> In no case shall the fact that the defendant is alleged to be a dangerous special drug offender be an issue upon the trial of such felonious violation, be disclosed to the jury, or be disclosed before any plea of guilty or nolo contendere or verdict or finding of guilty to the presiding judge without the consent of the parties.

The Government concedes that section 849(a) was violated, but contends the error was harmless because: (1) the judge learned only that a notice had been filed, not its contents, (2) the disclosure did not affect the trial judge's impartiality, and (3) the violation was attributable to the clerk's office, not the Government. None of these is relevant.

█ As noted by the second district judge, section 849(a) unambiguously pro-

---

present case, a timely objection was made, accompanied by a suggested alternative instruction.

**6.** We are also disturbed by an ambiguity in the statute that the defendants were convicted of violating. A single section of title 21 makes "attempt or conspiracy" to violate the Drug Abuse Prevention and Control Act a crime. 21 U.S.C. § 846. The statute seems to create only a single offense, denominated "attempt or conspiracy". The facts of this case indicate only a single course of action. We acknowledge that, under some circumstances, Congress may have intended separate punishment for attempt and conspiracy under section 846. Conceivably, a *conspiracy* to manufacture followed by a later, separate *attempt* to manufacture could constitute separately punishable offenses. For example, if two people agreed to manufacture amphetamines and ordered a chemical to further that purpose, the requirements of conspiracy would be met. If a year later one of them built a laboratory, assembled all necessary ingredients and started the manufacturing process but was apprehended before completing it, punish-

ment might be permissible for the conspiracy and the attempt. But here, in contrast, there is but a single course of criminal conduct.

Normally this case would be suitable for application of the doctrine of lenity whereby a "Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Whalen v. United States,* 445 U.S. 684, 695 n. 10, 100 S.Ct. 1432, 1440 n. 10, 63 L.Ed.2d 715 (1980) (quoting *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958)). *See also Busic v. United States,* 446 U.S. 398, 406–07, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). It is unnecessary for us to resolve this issue, however, in view of our reversal of the convictions for attempt.

vides that it is the "fact" of the notice, not the supporting details, that "shall" not be disclosed prematurely. *See United States v. Bailey,* 537 F.2d 845, 849 (5th Cir.1976), *cert. denied,* 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767 (1977).

The Government's contention that the disclosure did not affect the trial judge is pure speculation. As the district court in *United States v. Tramunti,* 377 F.Supp. 6, 10 (S.D.N.Y.1974), *modified on other grounds,* 513 F.2d 1087 (2d Cir.1975), noted in rejecting the same argument:

> [w]hether or not I believe that I was at all consciously or subconsciously influenced by having seen the notice before the verdict, I do not feel free to ignore the clear provisions of Section 849. The potential penalties to which Section 849 subjects a defendant are very grave indeed, and in seeking to have them imposed the government must precisely follow all of the procedural safeguards which the section requires.

Finally, while the Government was not directly responsible for the violation, it was certainly better situated than Taylor to have prevented its occurrence. Moreover, the Government offers no cogent reason why the defendant should bear the effects of the mistake regardless of whose fault the mistake was.

The dismissal of the special drug offender notice is affirmed.

CONCLUSION

Each defendant's conviction of conspiracy is AFFIRMED. Each defendant's conviction of attempt is REVERSED. The dismissal of the special drug offender notice as to Taylor is AFFIRMED.

FLETCHER, Circuit Judge, concurring:

I concur in the result, and I join all of the majority opinion except Part VII. I write separately on the effect of conviction of both attempt and conspiracy under 21 U.S.C. § 846. Although I agree that the sentences imposed for attempt must be va-cated, I rest my conclusion on a different reason.

21 U.S.C. § 846 (1976) provides that

> Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The statute thus prescribes punishment for one who "attempts or conspires" to commit any offense defined in the subchapter. Based on a given course of conduct, a defendant may be convicted of the section 846 offense if a jury unanimously agrees that the Government has proven the elements of *either* attempt or conspiracy. But a defendant may not be punished for *both* attempt and conspiracy based on a single course of conduct merely because the elements of both offenses are present.

To be sure, there will be situations where multiple punishments under section 846 will be proper. Such instances will arise when a defendant "attempts or conspires" to violate the drug laws on two completely separate occasions. For example, a defendant who engages in a conspiracy to manufacture and sell amphetamines that ends, and who later separately attempts by himself to manufacture and sell the substance, could be separately punished for two distinct violations of section 846.

The instant case does not present such a situation. The defendants acted in concert for the purpose of setting up an amphetamine laboratory in Taylor's home. Based on this conduct, they were found guilty of conspiracy. The statute does not authorize additional punishment for "attempt" based on the same conduct. I would vacate the attempt sentences without reference to the jury instruction given.