**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-4179**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

DARRYL COLTON FRAZER,

        Defendant – Appellant.

─────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah Lynn Boardman, District Judge.  (8:19-cr-00545-DLB-1)

─────────────

Argued:  January 24, 2024                    Decided:  April 9, 2024

─────────────

Before KING, WYNN, and RUSHING, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wynn and Judge Rushing joined.

─────────────

**ARGUED:**  Steven M. Klepper, KRAMON & GRAHAM, PA, Baltimore, Maryland, for Appellant.  Adam Kenneth Ake, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:**  Erek L. Barron, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

─────────────

KING, Circuit Judge:

Defendant Darryl Colton Frazer pursues this appeal from his convictions and sentences on drug and firearm offenses in 2023 in the District of Maryland. In the proceedings below, Frazer unsuccessfully moved to suppress evidence seized by the authorities in Silver Spring on July 25, 2019. In rejecting Frazer's suppression effort, the district court ruled that the police officers had reasonable suspicion to conduct an investigatory stop and could constitutionally search a black bag that Frazer had thrown away just before he was apprehended. During Frazer's jury trial in November 2022, he requested that the court give the jury an instruction defining a "reasonable doubt." After his proposed instruction was rejected, the jury convicted Frazer for three offenses. In March 2023, the court sentenced Frazer to 72 months in prison. Frazer appeals therefrom, challenging the denial of his suppression motion and the court's failure to give a reasonable doubt instruction. As explained herein, we reject both appellate contentions and affirm.

I.

A.

1.

On July 11, 2019, the Montgomery County Police Department (the "County PD") was alerted to a shooting in the White Oak area of Silver Spring, where blood was found

2

at the crime scene, but "no suspects or victims . . . had been identified." *See* J.A. 204.[1] An eyewitness explained to the police officers that one of those involved — either the shooter or the victim — was a Black man with dreadlocks. As a result, the County PD, including an officer named Brown, began seriously investigating the unsolved shooting incident.

The next day, July 12, 2019, Officer Brown patrolled the nearby community seeking information about the shooting. During his patrol, Brown saw two Black men of interest, later identified as Frazer and a person named Moore. Moore was wearing his hair in dreadlocks and had a large bandage visible on his upper arm. Brown said in the suppression proceedings that "other than being with [Moore,]" there was then nothing to indicate that Frazer was implicated in the July 11 shooting. *See* J.A. 100. Both men wore small black bags strapped across their bodies.

Officer Brown specifically noted the presence of the black bags when he saw the two men, and he attached law enforcement significance to the bags for good reasons: (1) such bags are a comfortable way to carry a firearm, and (2) such bags are "easy to discard in the event that someone was . . . being pursued by law enforcement." *See* J.A. 205. And they are commonly used by drug dealers. *See* J.A. 231-32. Brown said that he lost sight of the two men for a short time, but later that day saw them without any black bags. At no point that day did Brown initiate contact with either Frazer or Moore.

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal. The facts recited herein are drawn largely from the record of the hearings on the suppression issues, which were conducted in May 2021. They are explained in the light most favorable to the Government, as the prevailing party. *See United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004).

2.

Nearly two weeks later — on July 25, 2019 — the County PD was still investigating the July 11 shooting. That evening, between 7:00 and 8:00, Officer Brown and other officers were in a section of White Oak called Lockwood Drive. Lockwood Drive is about a half mile from the site of the July 11 shooting and traverses between apartment complexes, residential areas, and shopping centers. As Brown was patrolling Lockwood Drive in plain clothes and an unmarked police vehicle, he saw the two men he had observed on July 12 — Frazer and Moore — walking together down a road called July Drive.

July Drive is a dead-end road that ends in a cul-de-sac, and both sides of it are flanked by parking spaces. A sign is posted at the entrance to July Drive, where it intersects with Lockwood Drive, that says "Private Parking: No Trespassing." *See* Appellant's Op. Br. at 13. Only one side of July Drive has a sidewalk. On July 25, Officer Brown initially saw Frazer and Moore walking on July Drive itself — not using the sidewalk — toward the intersection with Lockwood Drive. As the two men approached Lockwood Drive, they veered slightly to their left, closer to the sidewalk, and crossed Lockwood Drive. At that point, each man had a black bag strapped across his shoulder that was quite similar to the bags Brown saw them wearing on July 12.

Officer Brown promptly notified other County PD officers that he was monitoring Frazer and Moore. After crossing Lockwood Drive, the two men walked westward along Lockwood Drive until they reached the entrance of a road called Heather Hollow Circle, which is the access road for several apartment buildings. Brown then lost sight of Frazer and Moore for about 10 minutes, after they entered the community accessed by Heather

4

Hollow Circle. Frazer and Moore soon reemerged, and Brown decided to approach them and inquire about the July 11 shooting incident.

Officer Brown also radioed and requested that two uniformed members of the County PD team — Officer Jacobs and Corporal Halko — assist him in approaching Frazer and Moore. Brown's idea was to stop Frazer and Moore for a "pedestrian violation," that is, because they were walking in the middle of July Drive instead of on its adjacent sidewalk. And Brown acknowledged in the suppression proceedings that his pedestrian violation idea "was, in part, a pretext to stop and question [Frazer and Moore] regarding the [July 11] shooting." *See* J.A. 212.

Officer Jacobs and Corporal Halko soon approached the apartment complex in marked County PD vehicles. At that point, Frazer and Moore were standing at the end of a breezeway, opposite the location where Jacobs and Halko had stopped. Upon seeing the uniformed officers, Frazer and Moore both exited the breezeway and began to run away from the officers, through the apartment complex. Officers Jacobs and Halko pursued.

After a couple of minutes of pursuit — with aid from others in the neighborhood — Frazer and Moore were found in an open stairwell of one of the three-story apartment buildings. As Officer Jacobs approached up the stairwell, he repeatedly yelled "Stop!" to Frazer and Moore. They did not stop, however, but responded by climbing over the second-story railing of the stairwell. Moore actually dropped from the second-story railing to the ground and continued to run away. Officer Jacobs started back down the stairwell and ordered Frazer — who was hanging on to the second-story railing — to "get down here." Jacobs threatened to use his taser on Frazer if he failed to comply. *See* J.A. 287 at 3:40-

5

50.  Frazer then climbed back over the railing of the stairwell and began to descend from it.  Officer Jacobs went up the stairs to meet Frazer and ordered him to drop his bag.

Instead of dropping his black bag, however, Frazer turned and walked away from Officer Jacobs.  Frazer went directly to the second-story railing where he had been dangling, took off his black bag, and threw it at least 40 feet away, into the center of the apartment courtyard, several feet below Frazer and Jacobs.  After throwing his bag away, Frazer complied with Officer Jacobs's command and got on the ground.  Frazer was then placed in handcuffs.

3.

Officer Brown — who arrived at the stairwell shortly before Frazer was handcuffed — recovered the black bag Frazer had thrown away.  When Brown picked up the bag, he felt the frame of a handgun.  He opened the bag and confirmed that it contained a firearm — a loaded semi-automatic 9mm pistol.  Officer Brown immediately told Officer Jacobs that the black bag contained the loaded firearm.  Brown also found that the bag contained approximately 100 grams of marijuana, in plastic bags.

While Officer Jacobs was completing his efforts with Frazer, Corporal Halko continued to pursue Moore, who had separated from Frazer and climbed over a fence onto property of the federal government.  After Frazer was secured, Jacobs assisted in the search for Moore.  With the assistance of Officer Jacobs and other officers, Moore was, after a foot chase, soon placed in handcuffs.  When apprehended, Moore was still in possession of his black bag.  That bag also contained a firearm — a loaded .38 revolver — plus approximately 100 grams of marijuana in plastic bags.

6

B.

1.

On November 18, 2019, Frazer and Moore were each charged with three offenses in a six-count federal indictment. Frazer and Moore then filed suppression motions in the district court. Frazer argued therein that the evidence seized on July 25, 2019 — specifically the contents of the black bag Frazer threw down into the apartment courtyard — should be suppressed because its seizure was constitutionally flawed. That is, Frazer asserted that the police officers lacked reasonable suspicion to stop him, and also fatally lacked a warrant that authorized their search of the black bag. Responding to Frazer's suppression motion, the prosecution asserted that the officers had reasonable suspicion to stop Frazer. The prosecutors also argued that the search of the bag did not implicate the Fourth Amendment because Frazer had abandoned it during his flight from the police.

After conducting its evidentiary hearing on May 18, 2021, the district court ruled that Frazer was not seized until he acquiesced to Officer Jacobs's show of authority, that is, when he began to lie down in the apartment stairwell. *See* J.A. 242-43. And the court further explained that Frazer was then not under arrest, he was then only the subject of an investigatory stop. From the bench, the court ruled that the relevant facts — as known by the police officers at the time of their seizure of Frazer — established reasonable suspicion to conduct an investigatory stop. The facts identified and deemed relevant by the court included the following:

- Either the suspect or the victim in the July 11, 2019, shooting was a Black man with dreadlocks;

7

- The next day — July 12 — Frazer was walking with Moore — a Black man with dreadlocks — about a mile from the location of the shooting. Moore had a fresh bandage on his arm. When first seen that day, both men were carrying small black bags;

- To Officers Brown and Jacobs, such bags are commonly used by drug dealers because they can easily be discarded and can comfortably carry a firearm. When Frazer and Moore were seen again on July 12, they did not have their black bags;

- On July 25, Frazer and Moore were seen again, and both were then carrying the same or similar black bags;

- On that occasion, the police officers had a good faith belief that Frazer and Moore had violated the law by jaywalking along July Drive;

- When uniformed police officers approached Frazer and Moore on July 25, both men ran from the area in headlong flight; and

- Frazer repeatedly disobeyed Officer Jacobs's orders to cease his flight from the officers and drop his black bag.

Viewed cumulatively, the court ruled that the relevant facts provided the police officers with ample reasonable suspicion to initiate an investigatory stop of Frazer.

The district court also ruled from the bench that the County PD officers were entitled to search the black bag seized from the apartment courtyard — where it had been thrown by Frazer — pursuant to their investigatory stop, in furtherance of officer safety. The court declined, however, to resolve the merits of the contention of the prosecutors that Frazer lacked Fourth Amendment standing to seek suppression of the black bag. Frazer's effort to suppress the drugs and firearm evidence was thus denied.

8

2.

After additional investigation, the operative indictment was amended by the grand jury with the addition of a conspiracy charge.  Frazer went to trial in Greenbelt on October 31, 2022, on the following four offenses:

- Conspiracy to Distribute Controlled Substances (Marijuana, Heroin, MDMA, Oxycodone, and Cocaine), in violation of 21 U.S.C. § 846 (Count One);

- Possession of a Controlled Substance (Marijuana) with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Two);

- Possession of a Firearm in Furtherance of Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(a)(i) (Count Three); and

- Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Four).

During the four-day trial, the prosecution presented police officer evidence relating to the relevant events and also introduced evidence obtained from Frazer's cellphone.[2]  The phone evidence included text messages between Frazer and others showing that Frazer was setting up sales of marijuana and seeking to broker deals for other drugs.  The text message evidence also revealed that Frazer had discussed obtaining firearms for himself and Moore.  The evidence included pictures of Moore and Frazer together, carrying the black bags and displaying cash.  Frazer did not testify and he did not introduce any evidence, but stipulated that he had possessed the loaded 9mm firearm unlawfully.

---

[2] After jury selection, Frazer's codefendant Moore pleaded guilty pursuant to a plea agreement.  He did not testify at trial.

9

During the charge conference with the trial judge, Frazer requested an instruction defining the term "beyond a reasonable doubt," consistent with Maryland's pattern instructions. Judge Grimm denied Frazer's instruction request but observed that "if I were inclined to give an instruction on beyond a reasonable doubt [it] seems like a pretty reasonable definition of beyond a reasonable doubt." *See* J.A. 275-76. The court then discussed with counsel the Fourth Circuit's guidance on such an instruction, recognizing that we have admonished the trial courts not to give it. The district court nevertheless said it would go along with a reasonable doubt instruction if both parties agreed to it. The prosecutors, however, objected to a reasonable doubt instruction and the court declined to give one. After stating that he disapproved of our precedent, Judge Grimm observed that he was "not going to mess [the trial] up," and that "if there were an appeal, it would be invited error." *See* J.A. 276.

On Count One, the jury convicted Frazer of conspiracy to distribute marijuana only, which was one of five drugs alleged. Frazer was also convicted of possessing marijuana with the intent to distribute it (Count Two), and of being a felon in possession of a firearm (Count Four). Frazer was acquitted of Count Three, which charged him with possession of a firearm in furtherance of a drug trafficking crime.

Judge Grimm having retired, Judge Boardman presided over Frazer's sentencing in March 2023. Frazer was sentenced to 72 months in prison on his felon-in-possession conviction (Count Four), and received sentences of six months on each of the marijuana-related convictions (Counts One and Two), to run concurrently with each other and with

the felon-in-possession sentence.  Frazer has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

In reviewing suppression issues, we review questions of law de novo and contested factual findings for clear error.  *See United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010).  When a motion to suppress has been denied by the district court, we accept the evidence in the light most favorable to the prosecution.  *See United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004).  A district court's failure to give a proposed jury instruction is reviewed for abuse of discretion.  *See United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010).

III.

Frazer appeals from the criminal judgment entered March 13, 2023, challenging the district court's denial of his suppression motion and its denial of his proposed reasonable doubt instruction.  We assess each of those contentions.

A.

The primary issue on appeal is whether the district court erred in denying Frazer's motion to suppress.  His suppression effort is pursued on Fourth Amendment grounds, and has two aspects.  Frazer maintains, first of all, that Officer Jacobs lacked reasonable suspicion to conduct an investigatory stop.  Second, Frazer argues that the warrantless search of his black bag by the County PD officers was unconstitutional.

11

1.

First, Frazer maintains that the district court erred when it ruled that Officer Jacobs had a reasonable suspicion of wrongdoing when he stopped Frazer in the stairwell of the apartment complex on July 25, 2019. Although the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures," *see* U.S. Const. amend. IV, it is settled that "an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." *See United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). Notably, reasonable suspicion "is a less demanding standard than probable cause." *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). But to establish reasonable suspicion, the authorities "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *See Terry*, 392 U.S. at 21.

In evaluating whether an officer had reasonable suspicion, the courts must consider the "totality of the circumstances . . . known to the officers at the time of the stop." *See United States v. Critchfield*, 81 F.4th 390, 394 (4th Cir. 2023). That is, the facts and observations available are considered in the aggregate, not separated in a "divide-and-conquer analysis." *See United States v. Arvizu*, 534 U.S. 266, 274 (2002). Facts that may independently have an innocent explanation can be more suspicious when viewed in light of others. *Id.* With that said, the standard of reasonable suspicion cannot be satisfied "by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied" upon. *See United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013). Our review of the

12

totality of the circumstances in this situation — as recognized by the trial court after its suppression hearings — is that Frazer's headlong flight and noncompliance with Officer Jacobs's commands establish the necessary reasonable suspicion.

a.

We start with Frazer's headlong flight. In its major decision on the issue, the Supreme Court's *Wardlow* opinion in 2000 recognized that a person's "headlong" and "unprovoked" flight upon seeing a police officer goes a long way toward establishing reasonable suspicion that the fleeing person was involved in criminal activity. *See Wardlow*, 528 U.S. at 124-25 (ruling that unprovoked headlong flight from police in high crime area constitutes reasonable suspicion). Put simply, the Court reasoned that "[h]eadlong flight — *wherever it occurs* — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124 (emphasis added). The Court discussed the concept of investigatory stops, however, and acknowledged that, although there may be innocent reasons to flee from the authorities, its precedent "accepts the risk that officers may stop innocent people" and that an investigatory stop empowers police officers to "detain the individuals to resolve the ambiguity" between innocent and suspicious actors. *Id.* at 125-26.

Several Justices in the *Wardlow* case emphasized that the Court was not adopting a per se rule that running from the police will always constitute reasonable suspicion. A person can have several possible motivations — including innocent ones — for running from a police officer. And the courts must consider evidence of flight in the totality of the

13

circumstances. We are counseled by the *Wardlow* Court to contemplate all relevant facts, including the following:

> [T]he time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the flight, and whether the person's behavior was otherwise unusual.

*See Wardlow*, 528 U.S. at 129-30 (Stevens, J., concurring in part).

Carefully assessed, the circumstances of Frazer's situation are more suggestive of wrongdoing than of innocent conduct. Frazer and Moore fled immediately when the County PD officers arrived at Heather Hollow Circle. Their flight was not by way of a brisk walk, it was a headlong run. The officers had not said anything to either Frazer or Moore before they fled. The mere arrival of the two uniformed police officers caused the headlong flight of Frazer and Moore. And when their flight began, the officers did not have any weapons or tasers drawn. Frazer and Moore fled together, while others in the nearby community did not flee. Put simply, their flight from the County PD officers was indicative of criminal wrongdoing.

Frazer nevertheless maintains that the probative force of his flight from the County PD officers should be minimal. He argues — without evidentiary support — that he was running out of fear of injury or death, which were justified because such interactions "with law enforcement [are] more dangerous for Black men than for others." *See* Appellant's Op. Br. at 17. The *Wardlow* Court addressed that very point, and acknowledged that minority citizens may believe "that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." *See Wardlow,*

14

528 U.S. at 132 (Stevens, J., concurring in part). And "evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed." *Id.* at 134. Despite such beliefs, the *Wardlow* Court acknowledged that there is a "commonsense conclusion that unprovoked flight can sometimes indicate suspicious motives," and that, "[t]he probative force of the inferences to be drawn from flight is a function of the varied circumstances in which it occurs." *Id.* at 135. In this situation, the circumstances of Frazer and Moore's headlong flight were indicative of wrongdoing.

b.

During and in combination with his flight, Frazer repeatedly ignored the commands of Officer Jacobs. Although running away from police officers can be a consummate act of evasion, other evasive acts, such as disobeying commands and instructions of such officers, can also factor into a reasonable suspicion analysis. Indeed, our Court has recognized that ignoring the orders of police officers can be relevant to a particularized suspicion calculus. *See United States v. Smith*, 396 F.3d 579, 586 (4th Cir. 2005); *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (regarding probable cause).[3]

Here, Frazer repeatedly ignored Officer Jacobs's commands to stop, even when Jacobs was only a few feet away. Importantly, Frazer did not merely ignore the commands of Jacobs and otherwise normally go about his day. Rather, Frazer responded with stark

---

[3] Several of the courts of appeals have acknowledged the proposition that a refusal to comply with a police officer's commands factors into a reasonable suspicion analysis. *See, e.g.*, *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983).

15

evasive actions such as climbing up and over the railing, hanging onto the railing, and moving up and down the stairs. And Frazer's final evasive action — throwing his black bag more than 40 feet down into the apartment courtyard, despite repeated orders from Jacobs to drop the bag — also substantiates an objective suspicion that criminal activity was likely afoot.

As the district court observed, Officer Jacobs knew that the type of bag Frazer was carrying is commonly used by drug dealers to conceal firearms and narcotics.[4] Although Frazer's mere possession of the bag could be suspicion-free conduct, Frazer did more than possess it. Frazer's flinging of his black bag 40 feet away, in contravention of Jacobs's direct commands to "drop" it, supported a suspicion that Frazer had contraband therein. Plus, the timing of Frazer's tossing of the bag — as the officers were closing in — enhanced the indication of suspicion.

c.

There are, however, other facts that provide additional probative force. These include the fact that Frazer had been seen carrying the same type of bag previously and that Frazer was twice seen walking with Moore. We accept, however, that Frazer's companionship with Moore offers little in the reasonable suspicion calculus. Moore simply matched a general description — a Black man with dreadlocks — of someone seen at the

---

[4] That the type of bags carried by Frazer and Moore are commonly used to carry guns and drugs by drug dealers proved to be clairvoyant.

16

July 11 shooting. But Moore — with his fresh bandage — might have been a shooting victim.

d.

Regarding the "pedestrian violation" idea about Frazer and Moore on July 25, 2019 — that is, they were walking down July Drive rather than on the sidewalk — the district court recognized that "[t]here is not a sufficient record before [the court] to allow [it] to rule on whether there was a violation." *See* J.A. 216. But the court recognized that Officers Brown and Jacobs had a "good faith belief" that Frazer and Moore had violated Maryland's Transportation Code, and that is why Brown believed he could stop them. *Id.* The court did not, however, specify whether that view relied on an objective definition or a subjective definition of good faith. The court also expressed doubt that July Drive was the type of road or street that is covered by the provision of the Maryland Transportation Code being relied on.

As our Court has recognized, "reasonable suspicion is an *objective* test, we examine the facts within the knowledge of [the police officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the *subjective beliefs* of [the police officer] to determine whether he thought that the facts constituted reasonable suspicion." *See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) (emphasis added). Without a clear indication of what the district court meant by "good faith belief," we are unable to determine what the court's "good faith" reference meant. Notably, however, the prosecutors do not contest the court's conclusion that the record is insufficient to decide whether there was a pedestrian violation of Maryland's Transportation Code.

17

Due to July Drive's characteristics — it actually resembles a private road — we will not consider whether Brown was objectively reasonable about a potential pedestrian violation.

Disregarding the pedestrian violation question, however, the totality of the circumstances nevertheless establishes a reasonable suspicion for an investigatory stop of Frazer. Prior to the stop, Frazer began his headlong foot chase in response to two uniformed police officers arriving nearby. He continued his flight despite their commands to stop and, before ending his flight, threw his black bag — known by the officers to be the type of bag drug dealers use to conceal contraband — more than 40 feet away.

2.

Frazer nevertheless contends that the warrantless search of his black bag — where his firearm was seized — was constitutionally flawed. He contends that the district court erred in ruling that officer safety was implicated, in that his black bag was more than 40 feet away and Frazer was handcuffed when the challenged search was conducted. We are satisfied, however, that Frazer had by then voluntarily abandoned his bag and that he lacks any Fourth Amendment standing to challenge the search. Although the court did not address the standing issue, we are entitled to do so if it will resolve his constitutional challenge to the search. As we have recognized, in reviewing the denial of a motion to suppress, "our inquiry is not limited to the district court's reasoning, and we are entitled to . . . affirm on any ground supported by the record." *See United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012).

In order to secure relief from an unconstitutional search, "a person must have a cognizable Fourth Amendment interest in the place searched." *See Byrd v. United States*,

18

584 U.S. 395, 410 (2018). And to possess a cognizable interest, the person must have "a legitimate expectation of privacy in the invaded place." *See Rakas v. Illinois*, 439 U.S. 128, 143. To establish a legitimate expectation of privacy, the person "must have a subjective expectation of privacy, and that subjective expectation must be reasonable." *See United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010) (internal quotation marks and ellipses omitted). And the "question of whether a given set of facts gives rise to a reasonable expectation of privacy is a legal question." *United States v. Ferebee*, 957 F.3d 406, 416 (4th Cir. 2020).

Put succinctly, a person cannot have a legitimate expectation of privacy in voluntarily abandoned property. *See United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995). In assessing whether a defendant maintains a reasonable expectation of privacy in a searched item, a reviewing court must perform "an objective analysis" and decide whether the defendant intended to abandon the item, and also decide whether his intention can be inferred from "words spoken, acts done, and other objective facts." *See United States v. Small*, 944 F.3d 490, 502 (4th Cir. 2019). In making such an assessment, the reviewing court can use "only objective information available to officers at the time they performed the warrantless search." *Id.*

Our decision in *Small* is instructive here. Small fled from the authorities in a vehicle, crashed it, and disappeared after leaving a trail of personal items, including clothing and a cellphone. *See Small*, 944 F.3d at 495-96. We ruled that, although "[a]bandonment should not be casually inferred," when the objective evidence "depicts a fleeing suspect tossing aside personal items while attempting to evade capture," an

19

abandonment can nevertheless be reasonably inferred. *Id.* at 502-03. In *Small*, the combination of flight and the locations of the abandoned items made it objectively reasonable for the officer to conclude that the abandonment was intentional, rather than accidental, especially when there was no evidence of an "attempt[] to retrieve." *Id.* at 503.

The Supreme Court has recognized that items that are discarded during a flight from law officers can be deemed abandoned. In its 1991 opinion in *California v. Hodari D.*, the Court ruled that a small rock of cocaine tossed away by a suspect who was in flight from the authorities had been abandoned. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991). And in 1924, in a moonshine case called *Hester v. United States*, the Court ruled that jugs of moonshine — thrown aside and discarded during a flight from the revenue officers — had been "abandoned," and thus were "not obtained by an illegal search or seizure." *See* 265 U.S. 57, 58 (1924).

In this situation, the objective evidence made it entirely reasonable for the police officers to believe that the black bag Frazer threw away was being voluntarily abandoned. When the bag was being searched, Frazer neither disclaimed ownership nor made any attempt to protect it from a search and seizure. The question of abandonment then, can be decided in this appeal on the basis of Frazer's actions and the surrounding circumstances.

Again, Frazer ran in a headlong fashion from the two uniformed police officers. Seconds before acquiescing to Officer Jacobs's commands — and when it became clear that he was about to be apprehended — Frazer threw his black bag over the stairwell into a public place more than 40 feet away. And this act of throwing away the bag directly contravened Officer Jacobs's command for him to "drop the bag." *See* J.A. 219-20.

20

On these facts, it was objectively reasonable for the officers to conclude that Frazer had relinquished any reasonable expectation of privacy he had in the black bag. The district court — which declined to rule on the standing contention — agreed that Frazer's tossing of the bag was "an effort to get rid of [the bag]." *See* J.A. 223-24. And on appeal, Frazer appears to concede that his toss of the bag into the apartment courtyard was intentional. He emphasizes that it was a flawed "split-second decision" in response to Officer Jacobs's command. *See* Appellant's Reply Br. at 12.[5]

Finally, Frazer argues that his tossing of the black bag into the apartment courtyard resulted from his subjective fear of the police officers and a fear of being tased. That is, Frazer argues that as a Black man he "face[d] no good choices" and simply decided to distance himself from his bag, because "[t]he closer that a bag remains to [him], the greater the risk that an officer will perceive a threat and discharge his taser." *See* Appellant's Reply Br. at 12. The primary problem with his contention is that the applicable abandonment test is an objective one, and must be viewed from the perspective of the officers involved. And the commonsense objective conclusion is that Frazer relinquished any legitimate expectations of privacy he had in the bag. He therefore lacks Fourth Amendment standing to contest the search.

---

[5] We also agree with several of our sister circuits that have ruled that a defendant lacks Fourth Amendment standing to challenge a search of items discarded in a public place during a flight from the police. *See United States v. Thomas*, 864 F.2d 843, 846 (D.C. Cir. 1989); *United States v. Bush*, 623 F.2d 388, 391 (5th Cir. 1980); *United States v. Collis*, 766 F.2d 219, 222 (6th Cir. 1985); *United States v. Vasquez*, 635 F.3d 889, 892, 894 (7th Cir. 2011); *United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011); *United States v. Tinoco*, 304 F.3d 1088, 1117 (11th Cir. 2002).

B.

Turning finally to Frazer's contention concerning the reasonable doubt instruction, he maintains that the district court fatally erred in that ruling. And a trial court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *See United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010).

We have a longstanding rule that "although the district court may define reasonable doubt to a jury . . . the district court *is not required to do so*." *See United States v. Walton*, 207 F.3d 694, 696-97 (4th Cir. 2000) (en banc) (emphasis added); *see also United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998) ("The trial court is not required to define reasonable doubt as a matter of course so long as the jury is instructed that a defendant's guilt must be proven beyond a reasonable doubt."). Our precedent is rooted in the proposition that "attempting to explain the words 'beyond a reasonable doubt' is more dangerous than leaving a jury to wrestle with only the words themselves." *See United States v. Hornsby*, 666 F.3d 296, 310-11 (4th Cir. 2012) (internal quotation marks omitted). And insofar as Frazer urges us to revisit our precedent on the propriety of a reasonable doubt instruction, "a decision of a prior panel cannot be overturned by a later panel." *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004).

We also reject Frazer's argument that the district court abused its discretion by declining to give a reasonable doubt instruction unless both parties agreed to it. Put simply, the court understood that it had the discretion to give the instruction, but knew that doing

22

so would risk undermining a jury verdict.[6]   Otherwise stated, the court weighed our admonitions about such an instruction against the risk of injecting reversible error into the trial.  Its decision was neither inconsistent with precedent nor an abuse of discretion.

IV.

Pursuant to the foregoing, we reject the appellate contentions pursued by Frazer and affirm the district court.

*AFFIRMED*

---

[6] Judge Grimm had explained to the lawyers that he was only interested in trying this case once, and said that giving the instruction when the parties did not agree could risk a new trial.  *See* J.A. 276.  His reading of our precedent animated his decision:  "My heart is with [Frazer], but my head is with the law in the Fourth Circuit."  *Id.* at 277.