OPINION.
The defendant-appellant, Quincy Jones, appeals from his conviction, after a plea of no contest, for one count of possessing a weapon under a disability, a violation of R.C.2923.13(A) (3); one count of carrying a concealed weapon, a violation of R.C. 2923.12; and one count of possession of cocaine, a violation of R.C. 2925.11(A). In his sole assignment of error, Jones asserts that the police lacked sufficient constitutional grounds to stop him and conduct the search that led to the discovery of the weapon and cocaine on his person. We disagree and thus affirm.
 I.
On August 31, 1998, Cincinnati Police Officer John Halusek responded to a radio report of drug usage and gambling at the Richmond Village apartments on Ezzard Charles Drive. He arrived in a marked cruiser, and the crowd of suspects dispersed. Later, Officer Halusek got a second radio report for the same activity and this time recruited other officers to accompany him. The plan was for the other officers to arrive surreptitiously from the rear to catch the suspects as they dispersed. According to Officer Halusek, "I'm too old and I don't like chasing these people anymore. These young gazelles, they can run a lot faster than I can."
As expected, when Officer Halusek arrived in front of the crowd in his marked cruiser, the suspects fled. According to Officer Halusek, the crowd had been gathered around a dice game. He testified that he broadcast a description of Jones to the other officers who were approaching from the rear.
Asked if Jones was a part of the group gathered around the dice game, Officer Halusek said, "He was part of the group. I don't know if he was gambling or not." He admitted on cross-examination that he never actually saw dice or drugs in Jones's hands. Officer Halusek also stated that he had "no idea" whether Jones was "associated" with those dicing — he emphasized, however, that his suspicion of Jones was based on his physical proximity to the dicing game and the fact that he started running immediately after he pulled up in his police cruiser.
According to Officer Halusek, he broadcast not only a physical description of Jones but the direction in which he was headed. Officer Jennifer Ernst was one of those officers brought along to apprehend the fleeing suspects. She stated that she had made several arrests in the same area, and that over half of them were for drugs or based on felony warrants. She received Officer Halusek's description of the suspects over the radio and less than a minute later saw Jones running toward her from the direction of the dicing game. She stated that when she first spotted Jones he was running, but not in "full trot run." She testified that Jones then saw her and "jutted" up the steps of one of the apartment buildings. Officer Ernst followed Jones and grabbed him on the second floor. She testified that she stopped him "because he was part of a gambling investigation."
According to Officer Ernst, Jones became "very nervous" after she stopped him. She then asked him what he was doing in the apartment building. She stated that Jones then pointed to two women sitting outside the door of their apartment and said that he was going to visit them. After talking to the two women, Officer Ernst believed Jones to be telling a lie. She stated that Jones "proceeded to get very nervous," and although she held the back of his pants, he started moving. She testified that his movement made her "kind of nervous" and worried for her safety. Consequently, Officer Ernst handcuffed Jones with the intention that she would hold him until Officer Halusek could positively identify him.
After handcuffing Jones, Officer Ernst testified that she did "a quick outer pat down search," which she specifically indicated was performed for her safety. She stated that she felt a hard object on his left side that she believed was a gun based on its shape. She testified that she could feel a barrel and the chambers. She then reached in and pulled a .22-caliber revolver out of Jones's left pants pocket.
According to Officer Ernst, she informed Jones that he was under arrest once she found the weapon. She stated that she then continued the search for other weapons and discovered marijuana in the left pocket and crack cocaine in the watch pocket.
 II.
In his sole assignment of error, Jones challenges the trial court's denial of his motion to suppress evidence. Specifically, he argues that because Officer Halusek did not see him engaged in any gambling, there was no basis to suspect him of criminal activity. Consequently, Jones argues, Officer Ernst lacked reasonable suspicion to stop him in the apartment building. Further, even assuming that Officer Ernst did have grounds for an investigatory stop under Terry v. Ohio (1968),392 U.S. 1, 88 S.Ct. 1868, Jones argues that she exceeded the permissible bounds of such a stop when she placed him in handcuffs and conducted a full search of his person. We disagree.
As this court has recently observed, it is a common misperception that, in order to effectuate a Terry stop, the police must actually observe the person engaging in criminal activity. SeeState v. Marsh (Sept. 3, 1999), Hamilton App. Nos. C-980788 and C-980789, unreported; State v. Ramey (Aug. 14, 1998), Hamilton App. No. C-970588, unreported. This is simply not true. If it were, there would be no need for a Terry stop, since the observation of a person engaging in criminal activity would be probable cause to arrest. As we pointed out in Marsh, in Terry
itself the police detective did not see anything more suspicious than the defendant and his companions loitering on a street corner in broad daylight, pausing to stare in the same store window and then conferring amongst themselves. Such actions are not even remotely illegal. Yet the Supreme Court held that an experienced police detective could have reasonably suspected the defendant and his companions of contemplating a daylight robbery, and that the police detective was entitled, therefore, to use his authority to stop them and ask them questions.
A Terry stop is investigatory. It requires only that the police have "reasonable suspicion" that criminal activity is afoot. "Reasonable suspicion" is a term of art, not readily definable, that contemplates something less than probable cause and yet more than a subjective hunch. Terry, supra, at 27, 88 S.Ct. at 1883. Activity that merely piques the curiosity of a police officer will not suffice. However, conduct that is not illegal by itself may, under the circumstances, give rise to a reasonable suspicion. As we stated in Marsh:
 It is entirely possible, therefore, that conduct which is perfectly legal may nonetheless justify a reasonable suspicion that criminal activity is afoot. [Citations omitted.] The conduct need only be by unusual, not criminal. The protection against the police acting out of curiosity, or on an "unparticularized suspicion" or "hunch," is that the police officer must be able to point to specific and articulable facts that, in light of his or her experience, support "specific reasonable inferences" of criminal activity.
Here, Officer Halusek received two tips of drug usage and gambling at the Richmond Village apartments. The tips were corroborated when, on the two occasions that he pulled up in his cruiser, a crowd of persons dispersed. On the second occasion, he actually witnessed dicing going on. Concededly, he did not see Jones dicing; however, he did see him as part of the crowd gathered around the dicing. Then, Jones turned and fled immediately upon the arrival of the police. When he spotted Officer Ernst, Jones "jutted" into a nearby apartment building.
We reject the argument, advanced by Jones, that this is a case in which all he did was run from the police. The legality of police stopping citizens for running from them withoutprovocation is an issue currently before the United States Supreme Court. See Illinois v. Wardlow (1999), U.S.,119 S.Ct. 1573, granting certiorari to People v. Wardlow (1998), 183 Ill.2d 306,701 N.E.2d 484. In Wardlow, the defendant was observed merely standing on the street, not appearing to be violating any laws, when the appearance of a police car caused him to suddenly take flight. Jones, however, was not idly standing on a street corner, or chatting with friends, when Officer Halusek appeared. Rather, he was standing with a crowd of people involved in an illegal activity, gambling. He then scattered along with others just as the police arrived.
We hold that Jones's observed actions, though not, perhaps, illegal in themselves, were sufficient to justify a reasonable suspicion that Jones was involved in criminal activity and then took flight. It may have been possible that Jones was merely an innocent spectator of the dicing, leaving quickly to avoid guilt by association; however, reasonable suspicion does not require that the conduct be irreconcilable with every theory of innocence.
Jones argues, however, that even if Officer Ernst was entitled to forcibly stop him, she necessarily arrested him when she went ahead and placed him in handcuffs. According to Jones, the severe restraint inherent in being placed in handcuffs must be seen as a full arrest — an arrest for which Officer Ernst lacked probable cause.
Again we disagree. Concededly, placing a citizen in handcuffs is a more drastic form of detention that merely being stopped and questioned. Terry cannot be read as a license for the police to stop and handcuff every person they may reasonably suspect of criminal activity. However, as this court recently noted, Terry does recognize that the police are entitled to take reasonable measures to ensure their own safety, including handcuffing should the situation warrant it. State v. Boykins
(Oct. 29, 1999), Hamilton App. No. C-990101, unreported. Boykins
is consistent with the recent trend of the federal circuit courts, including the Sixth Circuit, to allow the police greater latitude to use force to "neutralize" dangerous suspects during a Terry
stop. See, e.g., Houston v. Clark Cty. Sheriff (C.A.6, 1999),174 F.3d 809; United States v. Merkley (C.A.10, 1993), 998 F.2d 1062;United States v. Saffeels (C.A.8, 1992), 982 F.2d 1199; UnitedStates v. Esieke (C.A.2, 1991), 940 F.2d 29; United States v.Crittendon (C.A.4, 1989), 883 F.2d 326; United States v. Kapperman
(C.A.11, 1985), 764 F.2d 786; United States v. Taylor (C.A.9, 1983), 716 F.2d 701.
It must be emphasized, however, that the circumstances must warrant the use of handcuffs. The trend in federal court is directed toward situations in which the suspect is armed and dangerous. Without this element of risk, the "officer safety" rationale does not apply. The typical Terry stop remains a very brief detention, without handcuffs, sufficient for the police to ask a few questions relating to identity and the suspicious circumstances.
The question, then, is whether Officer Ernst was justified in handcuffing Jones. She testified that, as a member of the Criminal Apprehension Team (CAT), she was familiar with the area as being one with a high incidence of drug and other felony arrests. It is naive not to associate drugs and felonies with guns. She testified that Jones appeared very nervous in her grasp and continued to fidget. Alone with a jumpy suspect inside an unfamiliar apartment building, in an area known to her for its high incidence of serious crime, Officer Ernst stated that she placed the handcuffs on Jones out of a concern for her safety. As it turned out, her concern was justified when she pulled a gun out of his pants pocket while conducting a pat-down search of his outer clothing.
We hold that, under the circumstances, the "officer safety" rationale justified Officer Ernest in handcuffing Jones as part of the Terry stop. In sum, we reject Jones's argument that, by placing him in handcuffs, Officer Ernst had crossed the line that distinguishes an investigative stop from a de facto arrest.
Pursuant to the classic formulation of a Terry stop, Officer Ernst, given the justified concern for her safety, was entitled to conduct a pat-down search of Jones's outer clothing for a weapon. She testified that she felt the contours of a gun before reaching into his pockets to pull one out. This is a textbook example of the proper application of Terry.
Officer Ernst testified that, after discovering the weapon, she then formally placed Jones under arrest. She was then justified to make a full search of his person incident to the arrest. Chimel v. California (1969), 395 U.S. 752,89 S.Ct. 2034. The cocaine was discovered as a result of the search. There was, therefore, nothing constitutionally infirm about its discovery and seizure.
Based upon the foregoing, we hold that the police were justified in stopping Jones; that the gun found on his person was properly discovered as a result of a Terry pat-down search of his outer clothing; and that the cocaine was properly discovered as a result of a search incident to his arrest. The trial court therefore did not err in denying his motion to suppress.
Jones's sole assignment of error is overruled. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN and WINKLER, JJ., concur.