**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 23-4665

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

AUSTIN LODGE,

Defendant – Appellant.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Thomas S. Kleeh, Chief District Judge.  (1:21-cr-00030-TSK-MJA-1)

---

Argued:  September 10, 2025                    Decided:  April 30, 2026
Amended: April 30, 2026

---

Before GREGORY, AGEE, Circuit Judges, and Roderick C. YOUNG, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion.  Judge Young wrote the opinion, in which Judge Agee joined.  Judge Gregory wrote a dissenting opinion.

---

**ARGUED:** Hilary Lynn Godwin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant. Zelda Elizabeth Wesley, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee. **ON BRIEF:** William Ihlenfeld, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

YOUNG, District Judge:

This appeal requires us to decide whether a defendant abandoned his backpack—and thus forfeited any reasonable expectation of privacy in its contents—after fleeing from law enforcement and discarding the bag during the pursuit. The question turns not on abstract privacy interests, but on whether, viewing the objective circumstances known to officers at the time, the defendant's conduct amounted to abandonment under the Fourth Amendment.

Appellant Austin Lodge challenges the district court's denial of his motion to suppress evidence obtained from a warrantless search of his backpack. During a foot pursuit following a traffic stop, Lodge ran onto the porch of a nearby residence and attempted to place the backpack inside the home. A resident briefly opened the door and then closed it, rejecting Lodge's attempt. Lodge continued fleeing and was apprehended without the backpack. During questioning, but before officers recovered the bag, Lodge acknowledged that it belonged to him and stated that his children lived at the residence, which belonged to his children's grandmother. Officers later located the backpack in the backyard of the residence next to a shed and searched it without a warrant.

A magistrate judge recommended denying the motion to suppress on the grounds that Lodge had abandoned the backpack, and the district court adopted that recommendation in full. On appeal, Lodge contends that he merely concealed—rather than abandoned—the backpack by leaving it within the curtilage of a family residence. This is an argument some of our sister circuits have accepted in other contexts, but which this Court has not yet addressed—and we need not reach it here.

2

Rather, this case can be decided by simple application of the standard of review on appeal. And applying that standard, we conclude that the district court did not clearly err in finding abandonment based on the objective information available to officers at the time, including Lodge's rejection at the door immediately before the backpack was discarded. Because that factual finding resolves the Fourth Amendment inquiry, the unresolved question of whether a defendant retains a reasonable expectation of privacy in property discarded within a home familiar to the defendant (or within its curtilage) during flight from law enforcement is not before us. The district court's denial of the motion to suppress is therefore affirmed without reaching that question.

I.

A federal grand jury charged Austin Lodge with two counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), based on evidence recovered from a backpack seized and searched following his flight from a traffic stop.

Lodge moved to suppress the evidence obtained from the warrantless search of the backpack, arguing that the search violated the Fourth Amendment. The Government opposed the motion, asserting that Lodge lacked standing to challenge the search because he had abandoned the backpack during flight. The district court referred the motion to a magistrate judge, who conducted an evidentiary hearing, received witness testimony and exhibits, and issued a report and recommendation concluding that Lodge had abandoned the backpack and therefore lacked a reasonable expectation of privacy in its contents.

3

Lodge objected to the report and recommendation. After conducting *de novo* review, the district court overruled Lodge's objection, adopted the report and recommendation in full, and denied the motion to suppress. Lodge thereafter entered a conditional guilty plea preserving his right to appeal the suppression ruling. The district court entered judgment, and this appeal followed.

## A.[1]

In the early morning hours of December 13, 2018, Officer Jon Flanagan of the Harrison County Sheriff's Office was patrolling the East View area of Clarksburg, West Virginia. At approximately 3:00 a.m., Officer Flanagan observed a silver Nissan sedan with Pennsylvania license plates parked near a trailer. After the vehicle departed, Officer Flanagan followed it and observed a traffic violation. The driver—later identified as Austin Lodge—parked the vehicle, exited, and ran toward the nearest trailer. Officer Flanagan identified himself as a police officer and ordered Lodge to stop.

Lodge proceeded onto the front porch of the trailer (hereinafter "Property") and knocked on the door. A resident briefly cracked the door open, and during that interaction Lodge attempted to place a camouflage backpack inside the Property. The resident quickly shut the door, preventing Lodge from storing the bag inside the Property.[2] Lodge thereafter

---

[1] This recitation of facts is gleaned from the district court's opinion adopting the report and recommendation. JA 184–86.

[2] This finding of fact was based on Officer Flannagan's testimony at the suppression hearing. Defendant challenged Officer Flannagan's testimony by introducing into evidence Exhibit 3, which, in Lodge's view, sufficiently rebutted Officer Flannagan's testimony insofar as Officer Flannagan is overheard in the Exhibit stating he "did not (Continued)

4

fled toward the rear of the Property near a shed, carrying the backpack. Officer Flanagan pursued Lodge on foot and repeatedly directed him to stop.

After additional officers arrived, Lodge was apprehended and handcuffed. By then, Lodge no longer had the backpack in his possession. Officer Flanagan questioned Lodge about the Property and the whereabouts of the backpack, to which Lodge responded that his children lived at the Property, which belonged to their grandmother,[3] and that "nothing bad" was in the bag—therefore claiming ownership of the bag and its contents.

Officers then searched the area around the Property and located the camouflage backpack on the ground next to a shed, among other outdoor items. Lodge was not near the backpack when it was recovered. The officers did not have a warrant and did not obtain Lodge's consent to search the backpack. Upon searching it, officers discovered a large quantity of crystal methamphetamine, marijuana, Suboxone strips, and related items. These contents formed the basis for Lodge's instant charges.

B.

Lodge filed a motion to suppress the warrantless search of his backpack, principally arguing that the traffic stop lacked reasonable suspicion and that all resulting evidence was therefore the product of an unlawful stop. JA 19. In its response in opposition, the Government argued that both the stop and the subsequent search were lawful. JA 36.

---

know" if the homeowner opened the door. Although the district court did not expressly state so, it is obvious from the statement of facts that it found Officer Flannagan's testimony credible, notwithstanding Exhibit 3. This factual finding is discussed in further detail in Section IV(C), *infra*.

[3] *See* JA 133.

5

Relevant here, the Government also contended that Lodge lacked standing to challenge the search of the backpack because he had abandoned it. *Id.* (citing *United States v. Small*, 944 F.3d 490, 501–04 (4th Cir. 2019)).

By Order dated July 5, 2022, Chief District Judge Thomas Kleeh referred Lodge's motion to suppress to Magistrate Judge John Aloi for a hearing and the preparation of a report and recommendation. On July 13, 2022, the parties appeared before Magistrate Judge Aloi for a suppression hearing. The court heard argument, received exhibits, and considered sworn testimony from three witnesses: Officer Flanagan, Lori Barker (the homeowner of the Property), and Lodge.

Three days later, Lodge filed a supplemental brief in further support of his motion, seeking admission of body-camera footage recorded by another officer at the Property ("Exhibit 3"). The footage includes (1) Officer Flanagan's conversation with a colleague regarding Lodge's attempt to enter Ms. Barker's home through the front door; (2) Lodge's statements to law-enforcement officers concerning ownership of the backpack; and (3) Ms. Barker's conversation with an officer. JA 132–33. The video also captures Officer Flanagan stating that Lodge "knocked on th[e] door, but I don't think [Ms. Barker] answered, though." Ex. 3 at T08:23:38. Lodge argued that this footage conflicted with Officer Flanagan's suppression-hearing testimony and undermined the Government's abandonment theory.

The Government opposed admission of Exhibit 3, arguing primarily that the request was untimely and that the footage failed to "capture pertinent discussions that occurred

between the witnesses." JA 136. The magistrate judge granted Lodge's motion to admit

Exhibit 3 over the Government's objection. JA 142.

C.

After considering the parties' arguments, exhibits, and witness testimony presented

at the suppression hearing, the magistrate judge found that Lodge had abandoned the

backpack and recommended that the motion to suppress be denied. JA 145. Five factual

findings were "critical" to the magistrate judge's finding:

> (1) Defendant clearly claimed ownership of the backpack, (2) Defendant clearly stated that he threw the backpack in the place where LEOs[4] recovered it, (3) Defendant threw the backpack in the course of fleeing from LEOs, and Defendant acknowledged that he was fleeing in the moment when he threw it in that location where LEOs recovered it, (4) Defendant had permission to be on the property where he was fleeing and where he threw the backpack, and (5) LEOs did not have a search warrant for the backpack.

JA 166.[5] After establishing these facts, the magistrate judge held that Lodge abandoned

his backpack by stashing it next to the shed—relying solely on this Court's opinion in

*United States v. Small*, 944 F.3d 490 (4th Cir. 2019). JA 167.

In *Small*, the Fourth Circuit upheld the district court's denial of the defendant's

motion to suppress. There, the defendant challenged the government's seizure and

warrantless search of his cellphone pursuant to the Fourth Amendment. Small fled from

---

[4] Law Enforcement Officers.

[5] The magistrate judge also acknowledged that "(1) Defendant claimed that he did not know that he was being pursued by actual LEOs during the pursuit, but thought they could have been imposters, and (2) Defendant claimed that he intended to retrieve the backpack or have someone retrieve it for him." JA 167. However, the magistrate judge found these statements lacked credibility. *Id.*

7

police in his vehicle until he crashed into a gate, at which point he abandoned his car and continued fleeing on foot. *Id.* at 503. As officers searched for him, they recovered several items he had discarded during the pursuit. *Id.* One such item was Small's cellphone, which was uncovered in a public "grassy area, not on a sidewalk or a place where someone normally might be." *Id.* (citation modified). "Based on **these** circumstances, the district court's inference that Small abandoned his phone seem[ed] sensible." *Id.* (emphasis added).[6]

Accordingly, relying only on the reasoning articulated in *Small*, the report and recommendation concluded that Lodge likewise abandoned his backpack, analogous to the cellphone discarded in *Small*. JA 167. The report and recommendation also made three additional observations relevant here. *First*, it noted that Lodge "had every reason to abandon the backpack in the face of [the officers'] pursuit[, g]iven the backpack's incriminating contents . . . ." JA 167. *Second*, it reasoned that "the fact that Defendant had permission to be on the property at Moonlight Drive is of no moment"—because the circumstances of his flight from law enforcement negated any reasonable expectation of privacy he might otherwise have had under "normal circumstances." JA 169. *Third*, with respect to Exhibit 3, the report and recommendation explained that the body camera

---

[6] *Small* is not a unique decision; the Fourth Circuit routinely finds abandonment when a defendant discards property in a public space. *See e.g., United States* v. *Frazer*, 98 F.4th 102, 114 (4th Cir. 2024) (finding abandonment when "Frazer threw his black bag over the stairwell into a public place more than 40 feet away"); *United States v. Mayberry,* 125 F.4th 132, 145–46 (4th Cir. 2025) (finding abandonment when "Mayberry voluntarily left his backpack in the hotel's common stairwell").

footage "did not change the substance of the review and analysis of the record." JA 157, n.8.

D.

Lodge objected to the report and recommendation, principally arguing that the abandonment finding was erroneous because he (1) acknowledged ownership of the bag and (2) placed the bag on familiar property within its curtilage and away from the public. These factors, in Lodge's view, rendered his case distinguishable from *Small*. JA 175–81. In support of his position, Lodge cited *United States v. Most*, 876 F.2d 191 (D.C. Cir. 1989), and argued that, like the instant matter, it concerned a case of "temporary relinquishment, rather than abandonment." JA 178.

In *Most*, the defendant entered a grocery store that required customers to check their bags while shopping. 876 F.2d at 192, 199. The defendant complied by turning in his bag to a store clerk and asking her to watch it for him. *Id.* at 192–93, 198. The clerk placed the bag beneath the checkout counter. *Id.* at 192. Shortly thereafter, the defendant left the store, but only after requesting that the clerk continue watching the bag. *Id.* Law-enforcement officers entered the store moments later and searched the bag. *Id.* at 192–93.

At the suppression hearing, a cashier testified that it was common for customers to leave their bags with clerks after finishing their shopping, particularly because many customers lacked immediate transportation. *Id.* at 199. Another cashier testified that no other customer could have accessed the defendant's bag because she "was watching the bag" at all times. *Id.* at 197 n.12. On these facts, the court held that the defendant reasonably retained an expectation of privacy in the bag's contents, as he had "entrusted

9

[the bag] to the professional supervision of the cashiers with the clear understanding that they would protect [it] from intrusion by the public." *Id.* at 197, 199. Accordingly, in Lodge's view, "*Most* is an important case inasmuch as it demonstrates that a defendant can put a bag in a location and leave the immediate area, without giving up a reasonable expectation of privacy, so long as the bag is not exposed to the public and the defendant does not disclaim ownership." JA 179.[7] The Government did not respond to Lodge's objection.

The district court overruled Lodge's objection and adopted the report and recommendation, thereby denying Lodge's motion to suppress. The district court's decision to adopt the report and recommendation was also guided by *Small*. JA 190–92. The district court also made an additional factual finding that further strengthened its abandonment holding: it expressly found that the door was "crack[ed] open" and "shut quickly"—meaning it resolved this contested fact in favor of the Government, finding Officer Flannagan's suppression-hearing testimony credible, notwithstanding Exhibit 3. JA 185. Relatedly, and particularly important in resolving the instant appeal, the district court found this factual finding "**meaningful**" to its analysis, along with the fact that the bag was stored in a "place where someone would not normally be in the early morning hours during the month of December." JA 191 (emphasis added).

---

[7] Lodge again relies on *Most* in the instant appeal.

II.

Lodge's arguments on appeal largely mirror those raised in his objection to the report and recommendation. He again contends that abandonment must be distinguished from concealment, arguing that the latter applies where, as here, property is discarded in a nonpublic location—even if done while fleeing from law enforcement. Appellant Br. 5. Lodge also again relies on *Most* and distinguishes his case from a recent decision in this Circuit in which a defendant was found to abandon property after discarding it in a public space, *United States v. Frazer*, 98 F.4th 102, 114–15 (4th Cir. 2024). *Id.* at 8–9. Notably, Lodge posits that "[t]he testimony adduced at the suppression hearing showed that Mr. Lodge had permission from Ms. Barker to come and go without restriction"—therefore supporting his argument that his case is distinguishable from the many others in this circuit involving public discarding. *Id.* at 11.

The Government, on the other hand, argues that the district court properly concluded that Lodge abandoned his backpack because the facts reveal that his intent was to discard the bag to avoid being caught with its contents. Appellee Br. 7–11. *First*, Lodge fled from Officer Flanagan while traveling at speeds over 100 miles per hour. *Id.* at 8. *Second*, he then exited his vehicle with the backpack and attempted to pass it off to the person inside the trailer to distance himself from it. *Id.* *Third*, when the person inside refused to accept the bag, Lodge tried to shove the backpack inside the trailer. *Id.* *Fourth*, when that did not work either, Lodge fled with the backpack around the side of the trailer and discarded it on the ground near a shed before absconding into the woods. *Id.* The Government avers that

11

this course of conduct reveals that Lodge intended to voluntarily abandon the bag so that its contents would not be associated with him if he was apprehended by law enforcement.

Lodge responded by broadly rebutting the Government's arguments and reiterating that his case is distinguishable from abandonment, instead constituting permissible concealment. Appellant Reply 1–3 (citing *United States v. Ramirez*, 2023 U.S. App. LEXIS 24122, at *6 (5th Cir. Sept. 14, 2023) (finding no abandonment when defendant placed his jacket "on the private side of his **mother's** fence-ed in property line"—but not his own home—as such action constituted only an intent to "conceal his jacket and its contents" but not "discard, leave behind, or otherwise disavow ownership or privacy interest in the jacket")) (emphasis added).

### III.

In reviewing a district court's ruling on a motion to suppress, this Court reviews findings of fact for clear error and conclusions of law de novo. *Ornelas* v. *United States*, 517 U.S. 690, 699 (1996); *United States* v. *Burgess*, 684 F.3d 445, 452 (4th Cir. 2012). Where, as here, the district court has denied a motion to suppress, we view the evidence in the light most favorable to the Government. *United States* v. *McBride*, 676 F.3d 385, 391 (4th Cir. 2012).

Particularly relevant here, a district court's determination that a defendant "abandoned his privacy interest" in property is a finding of fact reviewed for clear error. *United States v. Mayberry*, 125 F.4th 132, 145 (4th Cir. 2025) (quoting *United States* v. *Ferebee*, 957 F.3d 406, 416 (4th Cir. 2020)). "This is true even though a well-supported factual finding of abandonment necessarily answers the ultimate legal question [of]

12

whether a defendant retains a reasonable expectation of privacy in the property at issue." *Id.* Because abandonment is a factual determination, reversal is warranted only if the finding is "against the clear weight of the evidence considered as a whole." *United States* v. *Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010). And where the district court's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse—even if it would have weighed the evidence differently. *Anderson* v. *City of Bessemer*, 470 U.S. 564, 573–74 (1985).

IV.

Lodge raises a single issue on appeal: whether the district court erred in denying his motion to suppress on the ground that he abandoned his backpack and therefore lacked a reasonable expectation of privacy in its contents.

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, warrantless searches and seizures are considered per se unreasonable—and thus unconstitutional—under the Fourth Amendment. *Small*, 944 F.3d at 501 (citation omitted). However, "[i]n order to secure relief from an unconstitutional search, 'a person must have a cognizable Fourth Amendment interest in the place searched.'" *Frazer*, 98 F.4th at 113 (quoting *Byrd v. United States*, 584 U.S. 395, 410 (2018)). That is, "'the person must have 'a legitimate expectation of privacy in the invaded place.'" *Id.* (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "To establish a legitimate expectation of privacy, the person 'must have a subjective expectation of

13

privacy, and that subjective expectation must be reasonable.'" *Id.* (internal citations omitted). Should a legitimate expectation of privacy exist, one generally enjoys the protections of the Fourth Amendment.

This generality is subject, however, "to a few specifically established and well-delineated exceptions." *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is abandonment. *Small*, 944 F.3d at 502. This Court has cautioned that "[a]bandonment shall not be casually inferred." *Mayberry*, 125 F.4th at 145 (quoting *Small*, 944 F.3d at 502).

To determine whether a defendant has abandoned property, courts conduct an objective inquiry into "whether the defendant intended to abandon the item and also decide whether that intention can be inferred from words spoken, acts done, and other objective facts." *Id.* (cleaned up). Central to that inquiry is the location where the property was discarded, as "[o]ne of the most crucial facts of an abandonment case is the **location** of the object in question." *United States v. Dillard*, 78 F. App'x 505, 510 (6th Cir. 2003) (emphasis added); *cf. United States v. Nowak*, 825 F.3d 946, 949 (8th Cir. 2016) ("Whether property is discarded in a public, private, or semi-private place is a factor in considering whether the property has been abandoned, but it is not dispositive.").

Consistent with that focus, courts assess the circumstances of the defendant's alleged disassociation from the property—most notably his physical actions and any denial or disclaimer of ownership—as those actions bear on whether the location of the discard objectively signals abandonment. *See Mayberry*, 125 F.4th at 145 (collecting cases). The analysis is temporally constrained, however, as courts may only consider "'objective

14

information available to officers at the time they performed the warrantless search.'" *Id.* (quoting *Small*, 944 F.3d at 502). That constraint carries particular significance where, as here, details revealed only after the warrantless search further inform whether the defendant maintained a reasonable expectation of privacy in the location where he discarded the property in question.

The district court's analysis reflects a transposition of *Small*'s public-place logic onto a private, curtilage-based setting. Although the court acknowledged that Lodge placed his bag next to a shed in the backyard of the Property, which was at least partially fenced but accessible to a passerby, it treated that placement as evidence of abandonment because the area was "a place where someone would not normally be" at that hour. JA 192. In doing so, the court emphasized the perceived remoteness of the location without meaningfully engaging with the constitutional significance of the bag's placement on private property that may have fallen within the curtilage of a home which Lodge perhaps visited—an interest bearing directly on whether Lodge retained a reasonable expectation of privacy.

That analytical misstep is underscored by the court's sweeping reliance on *Small* without first engaging in a meaningful privacy-interest analysis, a move that risks collapsing the doctrinal distinction between public and private discarding.[8] Yet the

---

[8] The report and recommendation appears to suggest that Lodge's reasonable expectation of privacy was extinguished by the fact that he was fleeing from law enforcement. JA 169 (stating it was "of no moment" that Lodge had an "expectation of privacy in normal circumstances" because Lodge was "engaged in criminal activity"). The distinction between "normal circumstances" on one hand and circumstances involving (Continued)

15

location of the object is among the most consequential facts in any abandonment inquiry, particularly where the property is placed on private land rather than discarded in a public space during flight.

To be sure, some of our sister circuits have expressly considered whether the Fourth Amendment extends to property discarded during flight within the confines of a home in which a defendant maintains a reasonable expectation of privacy. *See e.g.*, *Dillard*, 78 F. App'x at 510–12. But we have not. And contrary to Lodge's argument on appeal, this case does not present that unresolved question because the district court's abandonment finding necessarily precedes—and thus precludes—any analysis of whether the Fourth Amendment independently protects the bag's placement within the home or its curtilage. We address that sequencing issue further in subsection C, *infra*.

That said, it is appropriate to clarify the limits of *Small* before affirming the district court's judgment. While our precedent generally supports the conclusion that a defendant who flees and discards property in a public place has abandoned it, that precedent does not compel the same conclusion where property is discarded on private property in which the defendant maintains a reasonable expectation of privacy. Affirming the district court's decision without this clarification risks suggesting a categorical rule under which flight

---

"criminal activity" on the other is problematic. *Id.* Read broadly, it suggests that Fourth Amendment protection—particularly of the home—depends on the absence of unlawful conduct. That proposition conflicts with the well-established principle that "the Fourth Amendment's protection of the home does not turn on whether illegal activity takes place therein." *United States v. Green*, 106 F.4th 368,377–78 (4th Cir. 2024) (citing *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007)).

coupled with any act of discarding property constitutes abandonment—a rule this Court has never adopted.

Where property is discarded on private property, or within the curtilage of a home in which the defendant maintains a reasonable expectation of privacy, the analysis is necessarily more nuanced. In such circumstances, the facts may support either abandonment or constitutionally protected concealment, depending on the objective circumstances known to officers at the time of the search.

Accordingly, although the district court reached the correct result here, we emphasize that abandonment is not inferred from flight alone, but from flight viewed in context—including where and how the property was discarded.

B.

Based on the facts of this case, Lodge could have plausibly been found to possess a reasonable expectation of privacy in the Property. This Court's decision in *United States v. Green* informs that analysis. 106 F.4th 368 (4th Cir. 2024).

In *Green*, officers approached the defendant pursuant to an arrest warrant while he was socializing with his cousin at the cousin's home. *Id.* at 371. Green and his cousin were sitting in the backyard under a gazebo. *Id.* When officers arrived, Green removed a firearm from his shorts, held it in a non-threatening manner, and placed it on a shelf attached to one of the gazebo's poles. *Id.* Green then backed away toward the rear of the yard, and officers observed that he appeared to be "trying to figure out an avenue of escape." *Id.* Green was eventually apprehended against the back fence, approximately

17

twenty-five feet from the gazebo where the firearm remained. *Id.* at 371–72. After detaining Green, officers seized the firearm from the gazebo. *Id.* at 372.

Despite Green's flight and his decision to discard the firearm, this Court held that Green retained a reasonable expectation of privacy in his cousin's home and its curtilage. *Id.* at 376. In reaching this end, the Court emphasized that Green was not merely a casual social guest—expressly finding three factors dispositive:

> To be clear, we need not and do not decide today that all social guests have a reasonable expectation of privacy. But on the facts found by the district court, *see Green*, 2018 U.S. Dist. LEXIS 129550, 2018 WL 3655914, at *2, Green is not just any social guest. **First, he has a deep and familial relationship with the homeowner in question**. *Id.* Those are factors we have emphasized in holding that a social (but non-overnight) visitor has a reasonable expectation of privacy, *see Bonner*, 81 F.3d at 475; *Gray*, 491 F.3d at 153 (describing *Bonner*), because that kind of social connection can give rise to the requisite 'mutual trust' between visitor and host, *see Gray*, 491 F.3d at 146, 153. **Second, Green was a regular visitor to the Auth Road property over a long period of time, and his visits were exclusively social in nature**. *See Bonner*, 81 F.3d at 475; *cf. Gray*, 491 F.3d at 153 (finding no reasonable expectation of privacy where guest's commercial purpose outweighed any social relationship). **And while Green never spent the night at Yates's home, he had "free rein of the house,"** *Green*, 2018 U.S. Dist. LEXIS 129550, 2018 WL 3655914, at *2, **with the ability to enter all portions of the property and to bring friends with him when he visited**. Taken together, these factors indicate precisely the 'degree of acceptance into the household,' *Carter*, 525 U.S. at 90, that generates a reasonable expectation of privacy for a social guest. Under *Carter* and our own court's precedent, Green had a reasonable expectation that the Auth Road property and its curtilage was a 'place where he and his possessions [would] not be disturbed' by anyone but Yates and those Yates admitted. *See Olson*, 495 U.S. at 99.

*Id.* (emphasis added).

Comparable considerations are present here. Lodge has a familial relationship with the homeowner, as the Property belongs to his children's grandmother, and Lodge and his

18

children sometimes sleep there.  Lodge also had permission to be on the property, and—as the district court noted—he "resided there at times," reflecting his ability to routinely access the home.  JA 169.

Notably *absent* from the Court's calculus in *Green* was any suggestion that Green's reasonable expectation of privacy was diminished by the atypical circumstances at play— namely, (1) law enforcement's presence; (2) Green drawing his weapon in plain view of law enforcement; and (3) Green's subsequent capture 25 feet away from the gazebo, where law enforcement caught him by the fence.  Put differently, even though Green was engaged in criminal activity, the Court held that he maintained a reasonable expectation of privacy at his cousin's home.

Accordingly, considered in light of *Green* and the factors emphasized there, Lodge plausibly could have been found to possess a reasonable expectation that the Property and its curtilage were places where he and his possessions would not be disturbed.

C.

Such plausibility aside, the inquiry does not end there—this case is not so straightforward.  The question now shifts to whether Lodge abandoned his backpack, notwithstanding the fact that he discarded it within the curtilage of a home in which he may otherwise have had a reasonable expectation of privacy.[9]  The district court concluded that he did, and that finding was not clearly erroneous—even though the court did not undertake

---

[9] The Court assumes, for purposes of this analysis, that the shed in the Property's backyard was curtilage, as it was inside a fenced-in portion of the backyard.

19

a detailed privacy-interest analysis or expound on the precise location where the property was discarded. Those omissions do not undermine the abandonment determination because the relevant inquiry turns on "the objective information available to officers at the time of the warrantless search." *Small*, 944 F.3d at 502 (collecting cases).

At the time of the search, the Officers' knowledge was relatively limited. Viewing the record in light most favorable to the Government, as we must, the only information they possessed suggesting Lodge had permission to be on the Property was his own statement that his children lived there and that it was their grandmother's home.[10] The homeowner, however, denied knowing who was in her backyard when questioned by law enforcement, and—most significantly—turned Lodge away at the door after he attempted to place his backpack inside the home. Based on those facts, officers were faced with two competing inferences: either Lodge was truthful about his relationship to the homeowner and had permission to be on the property, or he was not. The officers inferred the latter, and the district court concluded that this inference was reasonable, particularly in light of Lodge's rejection at the door—a fact the court found "meaningful" to its analysis. In short, the district court found that the door being shut in Lodge's face so too shut the door on his Fourth Amendment claim. This Court agrees.

---

[10] Indeed, as noted *supra*, Section II, Lodge acknowledges in his appellate brief that "[t]he testimony adduced **at the suppression hearing** showed that Mr. Lodge had permission from Ms. Barker to come and go without restriction." App. Br. at 11 (emphasis added). Specifically, Ms. Barker testified that Lodge had free reign of the Property. JA 99–101, 107.

That said, the district court's factual finding that the door opened and then closed warrants further discussion in light of Exhibit 3. At the suppression hearing, Officer Flannagan testified that the door was opened and shut; however, during the earlier on-scene questioning reflected in Exhibit 3, he stated that he did not know whether it had. Notwithstanding Officer Flannagan's earlier indecision, the district court credited Officer Flanagan's suppression-hearing testimony and found that the door opened and then closed.

Generally, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not **contradicted** by extrinsic evidence, that finding, if not internally inconsistent, **can virtually never be clear error**." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)) (emphasis added). This remains true even if the reviewing court "would have weighed the evidence differently." *Anderson*, 470 U.S. at 574. By contrast, other courts have held that "[f]indings that are in plain contradiction of the videotape evidence constitute clear error." *United States v. Wallen*, 388 F.3d 161, 164 (5th Cir. 2004).

Exhibit 3 undoubtedly raises questions about the credibility of Officer Flanagan's suppression-hearing testimony concerning whether the door opened and closed. But it does not conclusively establish that the door never opened. The footage does not offer a definitive account—such as a conclusive showing that the door remained closed or other video evidence demonstrating that it did not open. Instead, it reflects Officer Flannagan's initial uncertainty as to whether the door was opened. Although this Court, sitting as the trier of fact, might have weighed Officer Flannagan's credibility differently in light of that

indecision, it cannot be said that the district court's factual finding was implausible, because Exhibit 3 does not plainly contradict his testimony. The district court was also better positioned to make this credibility determination, as it was most familiar with the record and best suited to view the facts in context.

Thus, while Exhibit 3 may weaken the evidentiary basis for the district court's finding, the assessment of its weight—and whether it undermines Officer Flanagan's later testimony—falls within the district court's province. The district court credited Officer Flanagan's testimony that the door opened and then closed, a credibility conclusion that, although not stated expressly, is evident from its factual findings. Because that determination is not plainly contradicted by Exhibit 3, it is not clearly erroneous.

In sum, while reasonable minds might differ in weighing Lodge's asserted connection to the property against his denied entry, the district court's abandonment finding rested on objective evidence suggesting that Lodge lacked permission to be there. That conclusion falls far short of clear error. This result does not change merely because the district court conducted a limited privacy-interest analysis and relied primarily on *Small*: even under a more detailed privacy analysis, the information available to the officers at the time—coupled with Lodge's rejection at the door—would still support the abandonment finding.

## D.

Lodge resists this outcome by advancing several arguments, primarily relying on the fact that he claimed ownership of the bag. To be sure, Lodge's acknowledgment that the bag was his cuts against a finding of abandonment. But that fact, while relevant, is not

dispositive. *See Mayberry*, 125 F.4th at 145–46. The touchstone of the inquiry is whether "the defendant intended to abandon the item," as inferred from objective facts. *Id.* at 145 (quoting *Frazer*, 98 F.4th at 114). For the reasons outlined above, the district court's conclusion that Lodge possessed such intent was plausible in light of the record viewed in its entirety.

Lodge's attempt to analogize his case to *Most* is unpersuasive, because, unlike in *Most*—and unlike similar cases within this Circuit, *see e.g.*, *United States v. Whiteside*, 2022 U.S. Dist. LEXIS 202335, at *9 (W.D.N.C. July 8, 2022) (report and recommendation), *adopted*, 2022 U.S. Dist. LEXIS 201024 (W.D.N.C. Nov. 4, 2022)—no third party was entrusted with safeguarding the backpack. There was no individual securing the bag on Lodge's behalf, nor any indication that the bag was placed under another's supervision for safekeeping. That absence renders this case fundamentally different from the line of cases in which a defendant relinquishes possession of property to another person for the purpose of maintaining privacy, rather than abandoning it.

Lodge further resists this conclusion by emphasizing that he (1) had permission to be on the property and (2) intended to retrieve the backpack. Both arguments are unavailing. *First*, the abandonment inquiry is objective, not subjective; Lodge's asserted intent is therefore not controlling. *See Mayberry*, 125 F.4th at 145. The focus instead is on what the officers reasonably could infer from Lodge's words and actions at the scene. *See id.*; *Frazer*, 98 F.4th at 114 (quoting *Small*, 944 F.3d at 502).

*Second*, Lodge's purported permission to be on the property is "of no moment." J.A. 169. As the report and recommendation acknowledged, Lodge "being permitted . . .

on the property, residing there at times, and having familiarity with the environs, evinces some expectation of privacy in normal circumstances." *Id.* But these were not normal circumstances (albeit not for the criminal reasons asserted by the magistrate judge). Lodge was turned away at the door. That rejection not only supported the inference that Lodge lacked permission to be on the property, but also plausibly indicated that any expectation of privacy he might otherwise have enjoyed was revoked at that moment.

This conclusion effectively resolves the appeal. As this Court has explained, "a well-supported factual finding of abandonment necessarily answers the ultimate legal question of whether a defendant retains a reasonable expectation of privacy in the property at issue." *Mayberry*, 125 F.4th at 145. Consequently, Lodge lacked any reasonable expectation of privacy in the backpack, and the district court was correct to deny his motion to suppress on that ground. *Id.*; *see also United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("[A] person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is [thus] precluded from seeking to suppress evidence seized from the property.").

## V.

After a careful review of the record in full, we hold that the district court's factual finding of abandonment was not clearly erroneous. Accordingly, the district court's finding is

*AFFIRMED.*

24

GREGORY, Circuit Judge, dissenting:

I agree with much of the majority's reasoning. Judge Young ably articulates the governing Fourth Amendment principles and this Court's two-pronged abandonment analysis with care. I also share the majority's dissatisfaction with the district court's legal analysis, particularly its failure to meaningfully engage with how the location of stowed property impacts abandonment. I even agree with the majority that this case can be decided by a simple application of the clear error standard of review.

Where I part ways is the remedy. Clear error review is deferential, but it is not a rubber stamp for decisions reached through an incorrect legal analysis. The majority opinion correctly underscores that the district court failed to address a central element of the privacy-interest prong of the abandonment inquiry: the location where defendant stowed the property. Notwithstanding this analytical misstep, the majority affirms the judgment. I cannot. When a district court applies an incorrect legal framework to reach a conclusion of fact, the appropriate response is not to affirm, but to remand for proper analysis in the first instance. Nor is it proper under clear error review for an appellate court to step into the role of factfinder, supplant the district court's erroneous analysis with its own, and decide issues of fact de novo. I would vacate the judgment and remand for a proper abandonment analysis.

## I.

The facts on which this dissent rests are simple. On December 13, 2018, at approximately 3:00 a.m., Defendant Austin Lodge was fleeing from law enforcement with a

camouflaged backpack.  Lodge first tried to stow his backpack inside a trailer home.  When that failed, he fled toward the rear of the property and stowed his backpack on the ground, next to a shed, within the partially fenced-in back yard of the trailer home.  Shortly thereafter, Lodge was apprehended by police.  In response to police questions about the trailer home and the backpack, Lodge answered that his children lived at the trailer home, that the trailer home belonged to his children's grandmother, and that there was "nothing bad" in the backpack.  Officers proceeded to search the backpack without a warrant or Lodge's permission.

Lodge filed a motion to suppress the warrantless search of his backpack.  The district court denied Lodge's motion, finding that he had abandoned his backpack.  The issue before us is whether it was clear error for the district court to conclude that Lodge abandoned his backpack.  I find that it was.

## II.

A district court's abandonment determination is a finding of fact, which we review for clear error.  *Ornelas* v. *United States*, 517 U.S. 690, 699 (1996); *United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020); *United States* v. *Burgess*, 684 F.3d 445, 452 (4th Cir. 2012).  Clear error includes findings that go "against the clear weight of the evidence considered as a whole." *United States v. Mayberry*, 125 F.4th 132, 145 (4th Cir. 2025) (citing *United States v. Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010)).  But that is not where the analysis ends.[1]  Factual findings should also be vacated when "they

---

[1] The majority's articulation of clear error tracks language repeated in some recent Fourth Circuit cases, but that phrasing is often quoted only in part.  Most recently, (Continued)

were derived under an incorrect legal standard." *Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021). This is because, as the Supreme Court has recognized, "there is a special danger that a misunderstanding of what the law requires may infect what is labeled a finding of fact." *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 18 (2024). A factual finding should be set aside where it is "induced by an erroneous view of the controlling legal standard." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 106 (4th Cir. 1995); *Alexander*, 602 U.S. at 18 (finding clear error where "a trial court bases its findings upon a mistaken impression of applicable legal principles.").

## III.

Here, the district court's analytical misstep regarding Lodge's privacy-interest and whether he intended to discard his backpack reflects an erroneous view of the legal standard for finding abandonment. Our abandonment analysis requires courts to conduct an objective inquiry into "whether the defendant intended to abandon the item **and** also decide whether that intention can be inferred from words spoken, acts done, and other objective

---

*Mayberry* adopted its formulation from *United States v. Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010), which quoted *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995), in turn quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). *Gypsum* and *Brice* recognize that clear error exists not only when a finding is against the clear weight of the evidence, but also when it is "induced by an erroneous view of the controlling legal standard." *U.S. Gypsum Co.*, 333 U.S. at 395; *Brice*, 58 F.3d at 106. *Martinez-Melgar*, which the majority cites for its clear error rule, quoted the evidentiary portion of the *Gypsum*/*Brice* rule as relevant to the issue presented in *Martinez-Melgar*. Subsequent cases have repeated that partial quote, which has mistakenly been read to suggest that clear error review turns solely on evidentiary weight. Properly understood, however, the clear error doctrine also encompasses findings reached under an incorrect governing legal framework.

facts." *Mayberry*, 125 F.4th at 145 (emphasis added, internal citation omitted); *United States v. Frazer*, 98 F.4th 102, 114 (4th Cir. 2024); *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010) (this Court must consider a defendant's subjective expectation of privacy and whether that subjective expectation is reasonable). Central to the first part of the abandonment inquiry is the location where property is discarded. Maj. Op. 14, 16. This is a subjective prong evaluated from the point of view *of the defendant*. As the majority pointed out, the district court reached a conclusion regarding the defendant's intent through an improper transposition of logic that all but ignored location. Maj. Op. 15.

Once we recognize that the district court's factual findings "were clearly erroneous under the appropriate legal standard," we must "reverse . . . and remand for further proceedings." *Alexander*, 602 U.S. at 7. Appellate review "can be undertaken only if a district court first makes the findings necessitated by the relevant legal standard." *United States v. Evans*, 90 F.4th 257, 262 (4th Cir. 2024). Having concluded that the district court failed to properly determine whether Lodge intended to abandon his property, Maj. Op. 15, we cannot summarily move on to the second part of the abandonment analysis and assess whether officers could objectively determine Lodge's intent at the time of the search. No, under clear error review, we are limited to vacating and remanding with instructions for the district court to apply the proper legal standard.

## A.

This dissent rests on a narrow but consequential point: findings of fact premised on an analytical misstep cannot be insulated by clear error review. Central to the abandonment analysis is whether Lodge "intended to abandon an item." *Mayberry*, 125 F.4th at 145. A

28

conclusion on that issue can only be reached after "the location where the property was discarded" is scrutinized. Maj. Op. 14. *See also, Mayberry*, 125 F. 4th at 145 (discussing the location where a backpack was left and concluding that "Mayberry's abandonment of the backpack in a place open to the public relinquished his reasonable expectation of privacy in the bag"); *United States v. Frazer*, 98 F.4th 102, 114 (4th Cir. 2024) (finding that defendant relinquished any reasonable expectation of privacy after throwing his bag "into a public place more than 40 feet away"); *United States v. Small*, 944 F.3d 490, 503 (4th Cir. 2019) (holding that defendant abandoned a cell phone while "fleeing from the police [and] crash[ing] through a gate in a place where he is not supposed to be").

Despite the critical importance that location plays in the abandonment analysis, the entirety of the district court's location analysis amounts to one of two things: either that the bag was stowed in "a place where someone would not normally be," J.A. 12, or that the location of the stowed bag was "of no moment" because defendant was fleeing. J.A. 169. Neither approach attempts to wrestle with how the location of the stowed bag—near a shed in a "private, curtilage-based setting"—bears "on whether Lodge retained a reasonable expectation of privacy." Maj. Op. 15. At best, the district court arrived at its conclusion(s) "without meaningfully engaging with the constitutional significance of the bag's placement on private property that may have fallen within the curtilage of a home Lodge frequented." *Id.* And at worst, the district court completely "collaps[ed] the doctrinal distinction between public and private discarding." *Id*. Either way, the district court's error amounts to application of an erroneous legal standard.

As the majority astutely noted, instead of engaging in any type of location-based analysis to determine whether Lodge maintained a privacy-interest in his backpack, the district court conflated location with defendant's flight. "[A]bandonment is not inferred from flight alone, but from flight viewed in context—including where and how the property was discarded." *Id.* at 17.[2] *Frazer*, 98 F.4th at 114 ("the combination of flight and the locations of the abandoned items made it objectively reasonable for the officer to conclude that the abandonment was intentional"). "While our precedent generally supports the conclusion that a defendant who flees and discards property in a public place has abandoned it, that precedent does not compel the same conclusion where property is discarded on private property in which the defendant maintains a reasonable expectation of privacy." Maj. Op. at 16. The majority opinion goes to great lengths to "clarify the limits of *Small*," the sole case on which the district court relied, and to reject "a categorical rule under which flight coupled with any act of discarding property constitutes abandonment—a rule this Court has never adopted." Maj. Op. 16, 17. But, by affirming the district court's abandonment finding, the majority provides future defendants with the exact remedy they are denying Lodge: application of the appropriate legal standard in the first instance.

Declaring the location of Lodge's backpack to be "of no moment," because he was fleeing when he placed it near a shed on private property ignores the *sine qua non* of our abandonment analysis and amounts to a textbook example of misapplication of a legal

___

[2] The majority correctly explains that Fourth Amendment protection does not depend on the absence of unlawful conduct. Maj. Op. 15, n. 9.

standard. The majority too ignores this Court's precedent and permits the entire abandonment analysis to turn only on "the objective circumstances known to officers at the time of the search." Maj. Op. at 17. As discussed below,[3] we should not sanction an analysis that permits one prong of the test to swallow the other. Instead, "[r]eversal is required when a district court has applied an incorrect legal standard that may have influenced its ultimate conclusion." *Tatum v. RJR Pension Inv. Committee*, 761 F.3d 346 (4th Cir. 2014).

The district court's—and now the majority's—error is exacerbated by the fact that the government bore the burden of proving the admissibility of evidence obtained pursuant to a warrantless search[4] in the first instance. *Small*, 944 F.3d at 502. Adhering to proscribed legal standards and burden of proof requirements is critical for upholding the rule of law. Even under clear error review the issue remains "whether the rule of law as applied to the established facts is or is not violated." *Heien v. North Carolina*, 574 U.S. 54, 72 (J. Sotomayor, dissenting). Our review—and this dissent—is not about reweighing the evidence presented to the district court. It is about confirming that the district court used the correct legal analysis when it applied law to fact. It is about ensuring that the government satisfied its burden under the proper legal framework. It is about preserving the rule of law for all who come before us.

---

[3] *Infra*, Part IIIB.

[4] "In assessing whether a finding is clearly erroneous, it is important to keep in mind the standard of proof that the district court was required to apply." *Alexander*, 602 U.S. at 33, n. 11.

Clear error review does not "protect findings which have been made on the basis of the application of incorrect legal standards or made in disregard of applicable legal standards." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1526 (4th Cir. 1984). Instead of affirming the district court's clear error, we must vacate and remand for proper application of this court's abandonment analysis. *Alexander*, 602 U.S. at 7 ("findings of fact, which were clearly erroneous under the appropriate legal standard" warrant vacatur and "remand for further proceedings").

### B.

Despite emphasizing the importance of location when determining whether a defendant intended to abandon his property, the majority claims that the district court's abandonment determination can prevail "because the relevant inquiry turns on the objective information available to officers at the time of the warrantless search." Maj. Op. 20. The majority misreads and misapplies the very case law on which it relies. "'In assessing whether a defendant' abandoned certain property, 'a reviewing court must perform "an objective analysis" and decide whether the defendant intended to abandon the item and also decide whether his intention can be inferred from "words spoken, acts done, and other objective facts."'" *Mayberry*, 125 F.4th at 145 (citing *Frazer*, 98 F.4th at 114 (quoting *Small*, 944 F.3d at 502)) (emphasis added). This analysis is not multifactorial; it is conjunctive. Limiting the "relevant inquiry" to "the objective information available to officers at the time of the warrantless search," Maj. Op. 20, vitiates our abandonment framework. Instead of curing the district court's failure to address the location-based

subjective prong of the abandonment analysis, the majority opinion seems to eliminate consideration of that prong in its entirety.

Abandonment cannot turn only on whether it was reasonable for officers to infer abandonment. *See Mayberry*, 125 F.4th at 145 ("[a]bandonment should not be casually inferred"). To do so would turn our abandonment analysis on its head and give no consideration to "whether **a defendant** retains a reasonable expectation of privacy in the property at issue." *Id*. (emphasis added). Thus, even if the district court's abandonment finding rested on objective evidence that Lodge lacked permission to be on the property where he stowed his bag, [5] Maj. Op. 22, that does not obviate the requirement that the abandonment finding also assess whether Lodge intended to abandon his property, a finding that can only be completed by grappling with the nature of the location where the property was left. "[T]here is a special danger that a misunderstanding of what the law requires may infect what is labeled a finding of fact." *Alexander*, 602 U.S. at 18. The district court's factual findings were so infected. Having concluded—along with the majority—that the district court's privacy-interest analysis was incorrect, all that remains is for us to vacate and remand for further proceedings consistent with this Court's two-pronged abandonment analysis.

---

[5] I do not agree with the majority's conclusion regarding the objective information available to officers at the time of the warrantless search, Maj. Op. Part IV.C., but I refrain from addressing this prong of the abandonment analysis because clear error review requires vacatur and remand once we discover that the district court's factual findings were predicated on an erroneous legal analysis. *Alexander*, 602 U.S. at 7.

IV.

I close by reiterating my respect for Judge Young's careful articulation of the legal analysis underpinning factual findings of abandonment. Addressing clear error review cannot stop at identifying the correct framework. Nor does it permit an appellate court to complete its own de novo fact finding analysis to shore up a district court's misapplication of law. For that reason, I would vacate the judgment and remand with instructions that the district court assess how the private, curtilage-based setting bears on whether Lodge abandoned his backpack.

Thus, I respectfully dissent.